Gerald Armond GALLEGO,
Petitioner–Appellant,

v.

E.K. McDANIEL, Warden, Ely State Prison; Ron Angelone, Director, Nevada Department of Prisons; Frankie Sue Del Papa, Attorney General of the State of Nevada, Respondents–Appellees.

No. 96–99006.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1996.

Decided Sept. 4, 1997.

---

Richard F. Cornell, Law Offices of Richard F. Cornell, Reno, NV, for petitioner-appellant.

Robert E. Wieland, Deputy Attorney General, Carson City, NV, for respondent-appellee.

Before: CANBY, NORRIS, and LEAVY, Circuit Judges.

LEAVY, Senior Circuit Judge:

Gerald Armond Gallego, a Nevada death row inmate, appeals from the district court's denial of his petition for a writ of habeas corpus, arguing that his state conviction and sentence for murder were unconstitutional due to (1) inappropriate trial venue, (2) improper denials of trial continuance motions, (3) unfair restriction on the scope of cross-examination, (4) insufficient evidence of guilt, (5) unlawful jury instruction, (6) denial of

1. The relevant underlying facts have been adequately summarized elsewhere. *See People v. Gallego*, 52 Cal.3d 115, 276 Cal.Rptr. 679, 802

effective assistance of trial counsel, and (7) prejudice resulting from the prosecutor's having a pecuniary interest in the case. For the reasons which follow, we affirm in part, reverse in part and remand for further proceedings.

FACTS AND PRIOR PROCEEDINGS [1]

On the afternoon of September 11, 1978, two teenaged girls, Kippi Vaught and Rhonda Scheffler, disappeared from the parking lot of a Sacramento shopping mall. Their bodies were found two days later in a rural area outside of Sacramento. Although both victims had suffered blows to the head, they died of gunshot wounds. Vaught's hands were tied behind her back. Scheffler, who had apparently been raped, died clutching a piece of cord similar to that used to bind Vaught's hands.

On the afternoon of April 24, 1980, two teenaged girls, Karen Twiggs and Stacey Redican, disappeared from the parking lot of a Sacramento shopping mall. Their bodies were found three months later in a rural area outside of Lovelock, Nevada. Both victims had died from blows to the head. Twiggs' arms were tied behind her back. A piece of rope similar to that used to bind Twiggs' arms was found nearby. The bodies were too decomposed for an autopsy to determine whether either victim had been raped.

On November 2, 1980, Mary-Beth Sowers and Craig Miller disappeared from the parking lot of a Sacramento shopping mall. Miller's body was found a few hours later in a rural area outside of Sacramento; Sowers' body was found in a different rural area three weeks later. Both victims had died of gunshot wounds. Sowers' body was too decomposed for an autopsy to determine whether she had been raped.

One of Miller's friends had been in the mall parking lot on November 2d and had seen Miller and Sowers leave in a vehicle with Gallego and Gallego's "wife," Charlene Williams.[2] The friend gave the police a de-

P.2d 169 (1990) and *Gallego v. State*, 101 Nev. 782, 711 P.2d 856 (1985) (per curiam).

2. Williams and Gallego were "married" twice in Reno. However, as Gallego was already legally

scription of Gallego, Williams, their vehicle, and its license number. The police eventually tracked Gallego and Williams to Omaha, Nebraska, where the two were arrested and brought back to California to stand trial for the Sowers/Miller murders.

Williams entered into a plea agreement with authorities in California, Nevada, and Oregon. Under the terms of that agreement, Williams (1) provided information concerning her involvement with Gallego in ten "sex slave" murders the pair had committed in those three states; (2) promised to testify against Gallego in the California and Nevada prosecutions; (3) pleaded guilty to two counts of second-degree murder, for which she received a sentence of less than seventeen years' imprisonment; and (4) was granted transactional immunity for the remaining eight murders.

In 1983, Gallego was tried, convicted, and sentenced to death in California for the Sowers/Miller murders. The following year he was brought to trial in Nevada for the Twiggs/Redican murders. During the guilt phase of Gallego's Nevada trial, the prosecution introduced evidence of the then-uncharged Vaught/Scheffler crimes.[3] The jury returned verdicts of guilty on two counts each of first degree kidnapping and first degree murder. During the penalty phase of Gallego's trial, the prosecution introduced evidence of the Sowers/Miller crimes. Gallego was sentenced to die. ·

The Nevada Supreme Court affirmed Gallego's conviction and death sentence. *Gallego v. State*, 101 Nev. 782, 711 P.2d 856 (1985). After all of his Nevada state court collateral attacks had failed, including petitions for post-conviction and habeas corpus relief, Gallego filed the instant petition for a writ of habeas corpus in federal district court. The

district court denied relief, and Gallego has timely appealed.

## ANALYSIS

### *Standard of Review*

■■■ We review *de novo* a district court's decision to grant or deny habeas corpus relief. *Woratzeck v. Stewart*, 97 F.3d 329, 332 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1443, 137 L.Ed.2d 549 (1997). We also review *de novo* any underlying state court conclusions of law. *Jeffries v. Wood*, 114 F.3d 1484, 1500 (9th Cir.1997) (en banc) (citing 28 U.S.C. § 2254(d)(1)). While we examine for clear error any factual findings made by the district court in reaching its decision, *Woratzeck*, 97 F.3d at 332, we must defer to state court findings of fact unless "based on an unreasonable determination of the facts in light of the evidence presented[.]" *Jeffries*, 114 F.3d at 1500 (citations and internal quotations omitted).

### *Discussion*

■■ As a preliminary matter, we must first determine which issues are properly before us on appeal. Gallego originally asserted forty issues in his federal habeas petition, but abandoned thirteen of these issues and voluntarily withdrew one more, subject to its later possible incorporation into sixteen of the remaining twenty-six issues. The district court then dismissed nine issues on the ground of procedural default, and portions of four others on the grounds of failure to exhaust, failure to state a claim, and abuse of the writ. The court finally disposed of the remaining seventeen issues on their merits in an elaborate and carefully reasoned fifty-four page opinion.[4]

---

married to other women at both times, his "marriages" to Williams were void *ab initio*.

**3.** To date, Gallego has still not been charged with the Vaught/Scheffler kidnapping and murders.

**4.** Gallego abandoned issues number 13, 15–17, 23, 26–29, 31, 32, 35 and 37, and voluntarily withdrew issue number 40. The district court dismissed issues number 22, 24, 25, 30, 33, 34, 36, 38, and 39 for procedural default, and dismissed portions of the following issues: Number 21 (failure to exhaust/failure to state a claim);

numbers 2 and 3 (failure to exhaust/abuse of the writ); and number 11 (abuse of the writ). The remaining seventeen issues .disposed of by the district court were numbers 1–12, 14, and 18–21.

One issue not briefed by either party to the instant appeal is the applicability *vel non* of the Antiterrorism and Effective Death Penalty Act ("Act"), Pub.L. No. 104–132, Title I, 110 Stat. 1214 (Apr. 24, 1996), *amending* 28 U.S.C. §§ 2244 and 2253–55 *and further codified at* 2261–66. At the time of oral argument, it was an open question whether the Act applied to ap-

The appellees argued below, and continue to insist on appeal, that Gallego waived and/or procedurally defaulted as to most of those seventeen issues. The appellees contend that the district court should have declined to reach their merits, because those issues either had not been exhausted in the state courts, or had "metamorphosed" in the federal courts from the form in which Gallego had presented them to the Nevada courts.

We reject this contention. The district court carefully and thoroughly dealt with each of these arguments, and properly rejected them on their merits. While our comparison of the issues raised by Gallego in each of his state proceedings with those presented in his federal habeas petition reveals certain differences in wording and presentation, we conclude that the district court correctly determined that the remaining issues in dispute had been fairly presented to the Nevada state courts.

This does not fully answer, however, the question of which of Gallego's original forty issues are now before us. In his opening brief, Gallego asserted only eight issues, which he reduced to seven in his reply brief. In their answering brief, the appellees rephrased Gallego's issues and expanded them into a total of thirteen issues. After careful review of the materials provided, we conclude that all of Gallego's issues fall into four broad categories, *viz.*, Fair Trial, Improper Jury Instruction, Ineffective Assistance of Counsel, and Prosecutorial Misconduct, each of which will be dealt with in turn.

## I. FAIR TRIAL

A. *Denial of Motion for Change of Venue*

Arguing that a change of venue was necessary because pervasive "media hype" made it impossible to assemble a panel of impartial local jurors, Gallego contends that the trial court deprived him of his right to a fair trial when it denied his motion for a change of venue. We disagree.

▇▇▇ A criminal defendant facing trial by jury is entitled to be tried by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Accordingly, a trial judge must grant a motion for change of venue if prejudicial pretrial publicity makes it impossible to seat an impartial jury. *Harris v. Pulley,* 885 F.2d 1354, 1360 (9th Cir. 1988). As we recently noted,

A defendant need only demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual. Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations. To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside.

*United States v. Sherwood,* 98 F.3d 402, 410 (9th Cir.1996) (as amended) (internal citations and quotations omitted).

### 1. Presumptive Prejudice

▇▇▇ Among the items to which Gallego cites in support of his claim of presumptive prejudice is the defense's "scientifically conducted poll" purporting to show pervasive local bias. From our review of the record, we agree with the district court's conclusion that the trial court properly rejected the poll as being itself biased as well as unscientific.

Gallego also lists some twenty-three examples of how the print and electronic media provided only negative information about him (e.g., a local restaurant's menu offering "Guilty Porker" pork chops and "Death Penalty" liver and onions, and the creation of a local fund to which the public could and did subscribe in order to help defray the community's costs of prosecution).

The Nevada Supreme Court properly noted that,

Given the realities of our age, it is unlikely that a high-profile criminal defendant will be presented with a venire of

---

peals, such as this one, that were pending on April 24, 1996. We have since concluded that

the Act does not apply to such petitions. *See Jeffries,* 114 F.3d at 1487, 1499.

uninformed individuals from which to select a jury. Indeed, it is conceded by many jurists that such a panel would least likely provide the considered, enlightened judgment that can best serve the demands of trial. As a result, courts abide by the following standards:

> To hold that the mere existence of any preconceived notion as to the guilt of innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Gallego v. State*, 711 P.2d at 859 (internal citations omitted).

The Nevada Supreme Court then proceeded to make the following observations with respect to the pretrial publicity surrounding Gallego's trial:

> In analyzing the constitutional adequacy of Gallego's jury, it should be noted that not all of the circumstances contributing to the pre-trial atmosphere were adverse to Gallego. Importantly, the victims were not local girls. Moreover, it was evident that many residents of Pershing County were opposed to the trial situs because of the expense to the County. Finally, there were no publications of admissions or confessions attributable to Gallego.

*Id.*

The district court's assessment was to the same effect:

> [T]he majority of the news stories were well-balanced, factual accounts of the pretrial events in Pershing County. Direct references to Gallego's California conviction for the murders of Sowers and Miller were accurate and factual. The news stories did not state or imply an opinion of guilt concerning the Redican/Twiggs murder [sic]. The statements made by donors to the prosecution fund clearly appeared as the opinions of individuals. There were no references to confessions or criticisms of defense strategies. A large part of the coverage involved a balanced debate about whether Gallego should have been tried in

Pershing County considering the budget restraints of the county. Notably, the reported facts that were material to Gallego's guilt or innocence were eventually supported by admissible proof at trial.

ER vol. I, # 11 at 16–17.

We conclude from our review of the record that, while there was a considerable amount of media attention devoted to Gallego's trial, Gallego has failed to show that the media publicity in his case was so prejudicial and inflammatory as to have constituted legal saturation. *Cf. Sherwood*, 98 F.3d at 410. Accordingly, we reject the contention of presumptive prejudice.

#### 2. Actual Prejudice

■ With respect to his claim of actual prejudice, Gallego begins by noting that nearly all of the venire, and most of the jurors empanelled, had some prior knowledge of the case. As we recently stated, however, "a defendant is entitled to an impartial jury, [but] he is not entitled to a jury completely ignorant of the facts. It is not all publicity that causes prejudice to a defendant, but only that publicity that operates to deprive the defendant of a fair trial." *Sherwood*, 98 F.3d at 410 (internal citations and quotation omitted).

■ Gallego devotes much of his argument concerning the allegedly biased jury panel to discussing the purported failings of certain prospective jurors. Whatever the truth of these characterizations of the prospective jurors, we are principally concerned here with those who were actually seated on the petit jury.

> Seven of the jurors were passed for cause by defendant. None of the jurors were shown to have formed the opinion that Gallego was guilty of the crimes with which he had been charged. All of the jurors selected indicated they could follow the law, and, if appropriate, return a sentence other than death if they found Gallego guilty.

*Gallego v. State*, 711 P.2d at 859.

On the strength of this record, we conclude that Gallego has failed to demonstrate the

existence of actual prejudice, *i.e.*, he has not shown "that the jurors exhibited actual partiality or hostility that could not be laid aside." *Sherwood*, 98 F.3d at 410 (internal citation and quotation omitted).

### B. Denial of Trial Continuance Motion

■ Gallego contends that the trial court abused its discretion by denying his motion for a continuance of trial, claiming that his counsel lacked sufficient time to prepare an adequate defense. We reject this argument.

Gallego was arraigned on January 12, 1984, and jury selection did not begin in his case until May 14, 1984, giving him four months in which to prepare a defense. There is no contention that Gallego was denied access to the prosecution's files, and we note that the trial court granted additional funding to Gallego for any outside (e.g., investigative) help his counsel might have deemed necessary to the defense. Most importantly, Gallego has failed to show what prejudice he actually suffered as the result of the denial of a continuance. As the district court noted,

> Gallego does not specifically identify any "critical" witness who, but for time limitations prior to and during trial, could have been produced. Gallego makes vague references to mental health experts and/or witnesses who could have been developed by investigating Williams's background. Even at this late date Gallego has failed to identify any "critical witnesses" and what the witness would have testified to at trial. Prior to and during trial in Nevada, defense counsel reviewed information developed by California defense investigators, transcripts of the California penalty phase proceedings, and met frequently with Gallego. In addition, in these proceedings, Gallego has had the opportunity and funds to investigate and develop facts supporting his claims. Gallego has been unable to develop any facts supporting the existence

> of witnesses who, but for time limitations prior to trial, could have been discovered and produced at trial. The court did not deny Gallego a fair trial by denying the motion for continuance.

ER vol. I, # 11 at 31.

In the absence of a showing of actual prejudice to Gallego's defense resulting from the trial court's refusal to grant a continuance, it cannot be said that the district court erred by denying relief on this ground. *Cf. United States v. Bauer*, 84 F.3d 1549, 1562 (9th Cir.) (direct appeal of federal criminal conviction), *cert. denied*, —— U.S. ——, 117 S.Ct. 267, 136 L.Ed.2d 191 (1996).

### C. Restrictions on Cross–Examination

■ Gallego argues that he was effectively deprived of his Sixth Amendment right to confront his accuser when the trial court denied his request that Charlene Williams be required to submit to psychological testing, and that the results of that testing be made available to Gallego at trial.[5] Gallego's stated purpose for the testing was to discredit Williams' testimony on cross-examination by introducing evidence of her alleged post-arrest aggressive homosexual conduct with multiple partners while in prison. Gallego argues that such evidence would have buttressed his claim that he didn't commit the crimes by implying that Charlene, as a highly intelligent lesbian dominatrix, might have been the one who kidnapped and murdered the victims.

The district court summarized its holding in the following language:

> The trial court did not commit constitutional error by excluding evidence of Williams's propensity toward homosexuality. She was not the defendant on trial. * * * Such evidence was in the nature of character evidence and, therefore, only admissible to rebut any evidence Williams may have offered to show she was a peace-

---

5. Gallego argues that the denial of his Sixth Amendment rights applies to both the guilt and penalty phases of his trial. Our review of the record shows that Gallego has raised the penalty phase issue for the first time on appeal. We therefore limit our discussion of this issue to the guilt phase of Gallego's trial. *See Campbell v.* *Kincheloe*, 829 F.2d 1453, 1455–56 n. 1 (9th Cir.1987) (declining to review issues raised by death penalty petitioner for first time on appeal); *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995) (same for issue presented by respondents for first time on appeal), *cert. denied*, —— U.S. ——, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).

ful person or not involved in the murders. Finally, all of the proof offered on those subjects was in the form of prison disciplinary reports which suffered from problems of multiple hearsay and relevance.

* * * Here, the only possible relevance of the evidence proffered by Gallego was to prove Williams's propensity for violent homosexual behavior. Gallego fails to identify any authority that gives a defendant a constitutional or statutory right to present evidence of a witness's character in order to prove conformity therewith.

The trial court also acted within its discretion and within constitutional parameters when it declined to order that Williams be subjected to psychological testing. Again, the results of such a test would only be relevant to show Williams's propensity to initiate the crimes. At no time did Williams testify that she was a peaceful individual or incapable of instigating the murders. There was no constitutional error in excluding this testimony or denying the request for psychological evaluation of Williams.

ER vol. I, # 11 at 22–23 (internal citations omitted).

The trial court did not forbid Gallego from introducing on cross-examination any evidence of Williams' character in general, or of her alleged propensity for violent homosexual behavior in particular. Rather, the court ruled that such evidence would be admissible only if Williams "opened the door" by insisting on her own truthfulness or peacefulness. This did not happen. Williams did not claim that she had not participated in the crimes charged, and she was subjected to a withering cross-examination that reduced her to tears on at least one occasion. In light of these facts, we conclude that Gallego was not deprived of his constitutional right to confront his accuser.

### D. Sufficiency of the Evidence

■ Citing Nev.Rev.Stat. § 175.291 and *O'Donnell v. Sheriff,* 91 Nev. 754, 542 P.2d 733 (1975), Gallego argues that Nevada law mandates that there be sufficient corroborating evidence, independent of any accomplice testimony, to connect the defendant with the commission of the offense charged. From this requirement, Gallego contends that he was denied his right to due process and equal protection because the Nevada Supreme Court decided, inconsistent with its prior decisions, that there was sufficient evidence apart from Williams' testimony to link Gallego to the crimes charged.

Gallego apparently never presented the second half of this argument to the Nevada state courts, despite having received an express warning from the district court to do so and having been granted leave to withdraw his initial habeas petition in order to return to the state courts and pursue his unexhausted claims. *See Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (per curiam) (a federal constitutional issue purportedly arising out of a state law claim is not exhausted when the state courts were only presented with arguments under state law). In the absence of a showing of either cause and prejudice for this failure, or that a "fundamental miscarriage of justice" would result if this issue were not decided in the first instance by the district court, we decline to reach the merits of this part of his argument.

With respect to the first half of Gallego's argument, we agree with the conclusion of the Nevada Supreme Court that the corroborating evidence was sufficient as a matter of law to link Gallego to the crimes charged.

An uncommon variety of macrame rope was found in the trunk of Gallego's Triumph 1500 automobile that matched in all respects the rope that bound the two victims. The State also introduced a photograph taken of Gallego and certain friends several years before the killings at the identical site where the victims were found. The burial place for the two young women was a remote site in a vast desert area, a spot shown to be familiar to Gallego. Additionally, the State proved that the defendant was in Nevada at Lake Tahoe one day following the disappearance of the victims. Finally, evidence of the murders of Kippie [sic] Vaught and Rhonda Scheffler showed a common scheme or plan consistent with the kidnapping, sexual mo-

lestation and eventual killings in the instant case.

*Gallego v. State,* 711 P.2d at 860.

The cumulative effect of this corroborative evidence, viewed in the light most favorable to the prosecution, was enough to tie Gallego to the Twiggs/Redican murders, and was sufficient for a rational trier of fact to have found the essential elements of the crimes charged beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979).

## II. IMPROPER JURY INSTRUCTION

 Gallego argues that he was denied his Eighth Amendment right to a fair hearing at the penalty phase of his trial because the jury was instructed that executive clemency might be available to Gallego if the jury decided to sentence him to life without the possibility of parole instead of death. Under the facts of this case, we must agree with this contention.

The two jury instructions of which Gallego complains (Jury Instructions 5 and 6) are quoted in full below:

The punishment of death may be imposed only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.

Otherwise, the punishment shall be imprisonment in the state prison for life with or without the possibility of parole.

You are instructed that the sentence of life imprisonment without the possibility of parole does not exclude executive clemency.

If the punishment is fixed at life imprisonment with the possibility of parole, eligibility for parole begins when a minimum of ten years has been served.

ER vol. II–A, # 30 at 5 (Jury Instruction Number 5).

Executive clemency involves a decision by the State Board of Pardon Commissioners to commute or reduce a defendant's sentence from life without possibility of parole to life with possibility of parole.

Executive clemency may also involve a decision by the State Board of Pardon Commissioners to shorten the time a defendant is eligible for parole.

The State Board of Pardon Commissioners consists of the Governor, the Attorney General, and the five Justices of the Supreme Court of the State of Nevada. The Board can change a sentence only by a majority vote, and only if the Governor is in the majority voting to change the sentence.

ER vol. II–A, # 30 at 6 (Jury Instruction Number 6).

Gallego objected to the second of these instructions (viz., Jury Instruction 6), and asked the court to give the following instruction instead:

Regarding the possible punishments, you are instructed as follows:

1. Life imprisonment with the possibility of parole is a sentence to life imprisonment which provides that the Defendant would be eligible for parole after a period of ten years. This does not mean that he would be paroled after ten years, but only that he would be eligible after that period of time.

2. Life imprisonment without the possibility of parole means exactly what it says, that the Defendant shall not be eligible for parole.

3. If you sentence the Defendant to death, you must assume that the sentence will be carried out.

ER vol. II–A, # 31 at 3 (Defendant's Instruction C). The trial court refused to give ·Gallego's proposed instruction "because [it is] not the law." *Id.*

Gallego argues that his proposed instruction should have been given in lieu of Jury Instruction 6, not because Instruction 6 incorrectly states the law, but because it inadequately states the law as applied to the facts of his particular case. Simply put, Gallego contends that, because he was already under sentence of death in California, the jury should have been apprised of just how remote his chances were of ever benefiting from the possibility of executive clemency in Nevada. *See* Nev.Rev.Stat. § 213.1099–4 ("... the board may not release on parole a

prisoner whose sentence to death or to life without possibility of parole has been commuted to a lesser penalty unless it finds that the prisoner ... is not under an order to be detained to answer for a crime ... in another jurisdiction[.]").

The parties agree that this issue is governed by *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) and by *Hamilton v. Vasquez,* 17 F.3d 1149 (9th Cir.1994) (as amended). In *Ramos,* the Supreme Court upheld the constitutionality of the so-called "Briggs Instruction" concerning the possibility of executive clemency as a factor for a jury to take into consideration during a capital trial's penalty phase proceedings.[6]

The Briggs Instruction reads as follows:

You are instructed that under the State Constitution a Governor is empowered to grant a reprieve, pardon, or commutation of a sentence following conviction of a crime.

Under this power a Governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole.

*Ramos,* 463 U.S. at 995–96, 103 S.Ct. at 3450–51.

The Supreme Court noted that the power of commutation was constitutionally relevant because it was part of the jury's permissible consideration of future dangerousness under *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). *Ramos,* 463 U.S. at 1001–1002, 103 S.Ct. at 3453–3454. The Court went on to hold, however, that there was no "diminution in the reliability of the sentencing decision of the kind condemned in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977)." 463 U.S. at 1004, 103 S.Ct. at 3455.

In *Gardner,* the jury had been given access to a presentence report that the defense had not seen. The death sentence was overturned "[b]ecause of the potential that the sentencer might have rested its decision in

part on erroneous or inaccurate information that the defendant had no opportunity to explain or deny[.]" *Ramos,* 463 U.S. at 1004, 103 S.Ct. at 3455. The Court in *Ramos* went on to note that

Gardner provides no support for respondent. The Briggs Instruction gives the jury accurate information of which both the defendant and his counsel are aware, and it does not preclude the defendant from offering any evidence or argument regarding the Governor's power to commute a life sentence.

*Id.* (footnote omitted).

Thus, one of the key factors emphasized by the Court in *Ramos* was that of *accuracy:*

Finally, we emphasize that informing the jury of the Governor's power to commute a sentence of life without possibility of parole was merely an accurate statement of a potential sentencing alternative. To describe the sentence as "life imprisonment *without possibility* of parole" is simply inaccurate when, under state law, the Governor possesses authority to commute that sentence to a lesser sentence that includes the possibility of parole. The Briggs Instruction thus corrects a misconception and supplies the jury with accurate information for its deliberation in selecting an appropriate sentence.

*Id.* at 1009, 103 S.Ct. at 3457 (emphasis in original; footnote omitted). *Accord Caldwell v. Mississippi,* 472 U.S. 320, 342, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985) (during the penalty phase of a capital case, jurors may be instructed on post-sentencing review by appellate courts, so long as the information provided the jurors is accurate) (O'Connor, J., concurring in part and concurring in judgment).

The question of accuracy figured largely in *Hamilton,* where we construed *Ramos* as requiring the reversal of the district court's denial of habeas relief based on a challenged penalty phase jury instruction in a capital case. We discussed the Eighth Amend-

---

**6.** The Briggs Instruction "was incorporated into the California Penal Code as a result of a 1978 voter initiative popularly known as the Briggs Initiative." *Ramos,* 463 U.S. at 995 n. 4, 103 S.Ct. at 3450 n. 4.

ment's application to such an instruction in the following terms:

> In analyzing whether a sentencing phase instruction violates the Eighth Amendment, a court must determine if there is a reasonable likelihood that the jury applied the instruction in such a way that prevented consideration of relevant mitigating evidence. A penalty phase instruction violates the Eighth Amendment if it prevents the jury from giving a reasoned moral response to the petitioner's mitigating evidence, or creates the risk that the death penalty would be imposed despite evidence which may call for a life sentence.

*Hamilton,* 17 F.3d at 1160 (internal citations omitted). We proceeded to hold that a lengthy and detailed instruction consisting of thirty-seven dense lines of explanation and admonition, "cobbled together" into a "confusing pastiche" and given in addition to and in explanation of a Briggs Instruction, was misleading to the jury and therefore constituted an inaccurate statement of the law under *Ramos. Id.* at 1161–64.

While Instruction 6 was relatively brief and not inaccurate as a general statement of the law, it was misleading as applied to the facts of Gallego's case. It could have prompted the jury into making erroneous speculations about the kind of sentence Gallego might actually have to serve. The combination of the two instructions as given suggests that, were Gallego sentenced to life without the possibility of parole, an exercise of clemency by the Board of Pardon Commissioners in reducing the sentence to life *with* parole would render Gallego eligible for parole in only ten years, if not less. That is not the law. One Nevada statute would preclude Gallego's parole before twenty years, and another would make it unlikely that he would be paroled at all. *See* Nev.Rev.Stat. § 213.1099–4 (reduction of sentence of life without possibility of parole renders prisoner ineligible for parole until he has served at least twenty years); Nev.Rev.Stat. § 213.1099–4 (prisoner whose sentence has been commuted from death or life imprison-

ment without parole may not be paroled if under detainer to answer for crime in another jurisdiction).

The Supreme Court's most recent pronouncement on this subject, *O'Dell v. Netherland,* —— U.S. ——, 117 S.Ct. 1969, 138 L.Ed.2d 351(1997) (No. 96–6867), is not to the contrary. In that case, the Court held that the rule announced by the plurality in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (viz., that a capital defendant must be permitted to inform his sentencing jury that he is parole-ineligible if the prosecution argues that the defendant presents a future danger), was a new rule for purposes of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *O'Dell,* —— U.S. at ——, 117 S.Ct. at 1979, 138 L.Ed.2d 351.

Here, by way of contrast, Gallego only sought to make the jury aware of the fact that, as the result of his past conduct and his California death sentence, it was not necessary to sentence him to death in Nevada in order to ensure that he could not be released after serving only a relatively brief period. *See Ramos,* 463 U.S. at 1004, 103 S.Ct. at 3455 ("The Briggs Instruction gives the jury *accurate* information of which both the defendant and his counsel are aware, *and it does not preclude the defendant from offering any evidence or argument regarding the Governor's power to commute a life sentence.*") (emphasis added). That position is consistent with the principle announced in *Ramos* and explained in *Hamilton.*

Accordingly, we conclude that the instructions as given inadequately stated the law as applied to the facts of Gallego's case, and find that the district court erred by ruling to the contrary.[7]

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Gallego claims that he was denied the effective assistance of counsel during the guilt phase of his trial because (1) the trial court failed to authorize a background investigation

---

**7.** Because *Ramos* antedates the finality of Gallego's case, there is no "new rule" issue for pur-

poses of *Teague.*

of Williams; (2) defense counsel failed to bring out all of Williams' prior inconsistent statements; and (3) defense counsel failed to challenge the terms of Williams' plea agreement. Gallego also claims that he was denied the effective assistance of counsel during the penalty phase of his trial because (4) defense counsel failed to obtain all of Gallego's medical history records.

In order to show that he was denied the effective assistance of counsel, "(1) the defendant must show that counsel's representation fell below an objective standard of reasonableness; and (2) the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir.1996) (citation and internal quotations omitted), *cert. denied*, — U.S. ——, 117 S.Ct. 2444, 138 L.Ed.2d 203, 1997 WL 251244 (U.S. June 9, 1997). This Gallego has not done.

### 1. Incomplete Background Investigation

 The district court summarized its findings with respect to Gallego's first argument concerning the failure to conduct a proper background investigation as follows:

There is no allegation in Gallego's brief that his trial counsel either did not attempt to investigate Williams, or that he unreasonably budgeted the resources available to him. Gallego acknowledges "trial counsel was extremely diligent in utilizing the limited time and resources available to him." Gallego has had the time and resources in the course of this proceeding to discover background material on Williams and has not brought any significant evidence to the attention of this court. There is also no allegation that any background investigation of Charlene Williams would have revealed information that might have changed the result at trial. Gallego has failed to support his contention that his counsel's failure to develop additional background evidence on Williams was prejudicial.

Gallego's ineffective assistance of counsel claim is equally unpersuasive as applied to his post-trial attorney. His counsel was given $5,000 for investigations relevant to the post-trial proceeding and chose not to devote the funds to an investigation of Williams. He also sought additional funds from the court, but his request was denied. Gallego has failed to identify any unreasonable conduct on behalf of his post-trial counsel.

Gallego also appears to contend that the court failed to authorize a sufficient investigation of Williams. Again, Gallego has not identified any information that has been uncovered in a subsequent investigation of Charlene Williams, which, if known at the time of the post-trial proceedings, could have changed the results.

ER vol. I, # 11 at 49–50. We agree with this assessment, and conclude that the district court did not err by ruling as it did.

### 2. Prior Inconsistent Statements

 Gallego's second argument, which appears to be an amalgam of several issues, suffers from two defects. First, Gallego himself freely admits that his trial counsel made a tactical decision not to keep Williams on the witness stand for two or three days in the hopes of bringing out every single inconsistent statement she'd ever made, for fear that it would only serve to emphasize the damning portions of her testimony. Second, this claim of error involves issues that were either abandoned or were properly found by the district court to have been procedurally barred from federal habeas review by an adequate and independent ground of state law. Accordingly, we find no error with the district court's ruling on this issue, either.

### 3. Williams' Plea Agreement

Gallego's third argument is really a combination of two issues: First, that his counsel was ineffective by failing to persuade the trial court to inform the jury that Williams might get good time credits in prison and serve less than the amount of time called for in her plea agreement; and second, that his attorney was ineffective by failing to challenge Williams' plea agreement on the ground that it was a contingent, revocable plea bargain violative of due process.

 With respect to the first contention, the jury was informed about the existence of a plea bargain between Williams and the prosecution, including the crimes to which she had pleaded guilty and the approximate amount of time she would serve. While the specifics of the plea agreement were not admitted into evidence at trial (all counsel having stipulated that the agreement itself would not be admitted at trial), it cannot be said that the district court erred by concluding that the jury was not denied "sufficient information to appraise the biases and motivations" of the witness. *United States v. Marbella,* 73 F.3d 1508, 1513 (9th Cir.) (quoting *United States v. McClintock,* 748 F.2d 1278, 1290 (9th Cir.1984)), *cert. denied,* ── U.S. ──, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996).

 As for Gallego's second argument, the mere fact that the terms of Williams' plea bargain were contingent upon her agreement to testify against Gallego does not rise to the level of a due process violation. She was required to testify fully and truthfully, and Gallego was permitted to impeach her credibility on the ground that the plea bargain might have encouraged her to lie. *See United States v. Moody,* 778 F.2d 1380, 1385 (9th Cir.1985), *as amended,* 791 F.2d 707 (1986).

#### 4. Gallego's Medical History Records

Gallego's fourth argument is that defense counsel had been ineffective at the trial's penalty phase by failing to discover and bring to the jury's attention all of Gallego's medical records which showed a history of mental illness. Gallego argues that his lawyer had been rendered ineffective by not having been given sufficient time and/or adequate resources to develop this line of attack, which would have buttressed the testimony of Dr. Joan Cartwright, Gallego's sole penalty phase witness. The district court found that Gallego had failed to present this issue to the state courts in his first post-conviction proceedings, and concluded that Gallego had not demonstrated cause and prejudice to overcome this procedural default. Gallego counters by arguing that appointed counsel in his first round of state post-conviction

proceedings was also ineffective by failing to bring this line of inquiry to the state courts.

 We agree with the district court's determination that this issue was not fairly presented to the state courts until Gallego's second round of state post-conviction proceedings. Moreover, even if we were inclined to reject the findings of the Nevada state courts that the failure of Gallego's appointed post-conviction counsel to timely assert this issue (i.e., in the first round of his state post-conviction proceedings) did not constitute ineffective assistance on his part, such a determination would not constitute "cause" for Gallego's failure to timely assert the issue, *Bonin v. Vasquez,* 999 F.2d 425, 429–30 (9th Cir.1993) (per curiam order), nor could it be used to "bootstrap" a finding of ineffectiveness on the part of Gallego's trial counsel for conduct occurring during the trial's penalty phase. *Id.; see also Jeffers v. Lewis,* 68 F.3d 299, 300 (9th Cir.1995) (en banc) (plurality opinion). Finally, on the strength of this record, we conclude that no "fundamental miscarriage of justice" will result by holding as we do. *See id.* at 300 (quoting *McCleskey v. Zant,* 499 U.S. 467, 494–95, 111 S.Ct. 1454, 1470–71, 113 L.Ed.2d 517 (1991)).

### IV. PROSECUTORIAL MISCONDUCT

 According to Gallego, the prosecutor in his Nevada case was approached by a Sacramento journalist after the jury had convicted Gallego and sentenced him to death. A contract was entered into that eventually included the prosecutor, two of the investigators involved in the case, and Williams, all of whom agreed to collaborate on a book to be written about the events leading up to and including the trial. The prosecutor received approximately $5,000 in royalties from the book. Williams could not, and did not, receive any royalties from the book, and the investigators later repudiated the contract. Citing such cases as *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) and *Ganger v. Peyton,* 379 F.2d 709 (4th Cir.1967), Gallego contends that the prosecutor's pecuniary interest in the case constituted misconduct warranting reversal of Gallego's conviction. We disagree.

In *Marshall,* the Supreme Court observed that a prosecutor's direct pecuniary interest in the outcome of a case that has an impact on the prosecutor's decision whether or not to enforce a particular statute may have constitutional ramifications. 446 U.S. at 249–50, 100 S.Ct. at 1616–17. Gallego has neither alleged nor shown that any pecuniary interest which the prosecutor had arose prior to the conclusion of trial or that it prejudiced Gallego's defense in any way. Similarly, *Ganger* involved a conflict of interest where the prosecutor criminally prosecuted the husband of a client in civil (i.e., divorce) proceedings. In that case there was a direct conflict between the duties of his office as a prosecutor and those owed to his client. 379 F.2d at 714. Gallego has neither alleged nor shown in this case that any similar duties ran from the prosecutor to him.

■ More to the point, Gallego must allege and show resultant prejudice; *i.e.,* he must demonstrate that his trial was rendered fundamentally unfair by the conduct of which he complains. *See Wycoff v. Nix,* 869 F.2d 1111, 1113 (8th Cir.1989); *Rose v. Duckworth,* 769 F.2d 402, 405 (7th Cir.1985). Gallego has neither alleged nor shown that he was prejudiced by such conduct.

Gallego makes several related arguments, equally meritless. Gallego contends that the three witnesses who collaborated with the prosecutor on the book contract had a motive to give false testimony or to distort their testimony and that the prosecutor had a motive to knowingly present such testimony. However, Gallego has not established that any of the three witnesses perjured themselves or that the prosecutor knowingly offered perjured testimony.

Gallego also argues that the prosecutor's collaboration on the book during the pendency of Gallego's direct appeal violated his rights to due process and to the effective assistance of counsel on appeal. He contends the book contract involved collaboration with the confessed accomplice and conflicted with the duties owed by the prosecutor to his clients, *i.e.,* the citizens of the State of Nevada. With respect to these assertions, Gallego has not shown that he was prejudiced in his right to a direct appeal or that he has standing to allege either ineffective assistance of counsel or conflict of interest on behalf of the State of Nevada and against the prosecutor.

Finally, Gallego asserts that the prosecutor's actions compromised the trial judge's impartiality. Gallego has not previously presented this claim to the state courts, and has shown no cause or prejudice justifying this failure. Accordingly, we will not review this claim. To the extent that Gallego alleges judicial bias, such claim has not been exhausted and is dismissed as an abuse of the writ.

In light of the above, we conclude that the district court did not err by rejecting the claims of prosecutorial misconduct.

## CONCLUSION

In light of the erroneous jury instructions given during the penalty phase of Gallego's trial, we REVERSE that portion of the district court's decision and REMAND with instructions that the district court issue the writ unless, within a time set by the district court, the State of Nevada proceeds to resentence Gallego.

AFFIRMED in part, REVERSED in part, and REMANDED with instructions.