138 F.3d 787
 98 Cal. Daily Op. Serv. 1700, 98 Daily Journal
D.A.R. 2399
Steven King AINSWORTH, Petitioner-Appellee,
v.
Arthur CALDERON, Warden, Respondent-Appellant.
Steven King AINSWORTH, Petitioner-Appellant,
v.
Arthur CALDERON, Warden, Respondent-Appellee.
 Nos. 96-99017, 96-99018.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 14, 1997.
Decided March 10, 1998.
 
 J. Robert Jibson, Supervising Deputy Attorney General, Sacramento, CA, for respondent-appellant/cross-appellee.
 Quin Denvir, Federal Defender, Sacramento, CA; James S. Thomson, Berkeley, CA, for petitioner-appellee/cross-appellant.
 Appeals from the United States District Court for the Eastern District of California; Lawrence K. Karlton, Chief District Judge, Presiding. D.C. No. CV-90-00329-LKK/PAN.
 Before: BROWNING, LEAVY, and TROTT, Circuit Judges.
 LEAVY, Senior Circuit Judge:
 
 
 1
 This case arises out of a petition for a writ of habeas corpus as limited by 28 U.S.C. § 2254, filed by Steven King Ainsworth, a California death row inmate. The Warden of San Quentin Prison (the "State") appeals from the district court's grant of relief on Ainsworth's claim that he received ineffective assistance of counsel, and Ainsworth cross-appeals from the district court's denial of relief on his remaining claims. We affirm in part, reverse in part, and remand with instructions to deny the writ.
 
 FACTS AND PRIOR PROCEEDINGS
 
 2
 Seng "Nancy" Huynh was last seen alive by her husband on the afternoon of September 12, 1978, when she left home to work the swing shift at her job in downtown Sacramento. A few minutes after 3:00 p.m., Ainsworth and Donald Gene Bayles entered the public parking lot where Huynh was parking her car. Shouting, "Come on, there's one over there," Ainsworth separated from Bayles. Shortly thereafter, Bayles heard a "pop" sound. Bayles found Ainsworth sitting in the driver's seat of Huynh's car, with Huynh sitting beside Ainsworth. Bayles got in the front seat, and with Huynh seated between the two men, Ainsworth drove Huynh's car out of the parking lot.
 
 
 3
 Although Bayles claimed not to know it at the time, Ainsworth had shot Huynh in the left hip with a .45 caliber handgun. The bullet passed through her pelvis and lodged against her right hip. Despite Huynh's repeated pleas for help, Ainsworth refused to take her to a doctor or leave her where someone might find and help her. Instead, he confined Huynh to the car's trunk (because of her moaning) and later, the rear seat, where, according to Bayles, he raped her.
 
 
 4
 Some twenty-four hours after being shot, Huynh died. Ainsworth and Bayles dumped her nearly naked body in a wooded area south of Elk Creek, California. The two men then headed towards San Francisco where they picked up a hitchhiker. After dropping off the hitchhiker in downtown San Francisco, Ainsworth and Bayles separated. Bayles spent the night outdoors and made his way back home to Corning, California.
 
 
 5
 On September 14, 1978, police discovered Huynh's car in Pacifica, California, less than a mile from Ainsworth's residence. The police found an expended .45 caliber shell casing between the vehicle's front seat cushions, and human blood on the rear seat cushion and on paper bags in the trunk. Several items found in and near the automobile had Ainsworth's and Bayles's fingerprints on them. Two days later, Huynh's purse and brassiere were found at a highway interchange some five miles north of the California-Oregon border. Among the items found in the purse was a time card bearing Huynh's signature and Bayles's fingerprints.
 
 
 6
 About four months after Huynh's abduction and murder, Bayles was arrested and led authorities to the clearing where he and Ainsworth had hidden the body. The body was in an advanced state of decomposition. On May 3, 1979, police arrested Ainsworth in San Francisco, and charged the two men with first degree murder with two special circumstances, kidnapping and robbery.[1]
 
 
 7
 The State tried the defendants jointly. The State based its case upon two theories. The first theory, which was abandoned before the close of trial, was that when Ainsworth shot Huynh during the commission of the robbery and kidnapping, he willfully, deliberately, and with premeditation did so to murder her. The State's remaining theory was that after the shooting, and in the course of the robbery and kidnapping, Ainsworth deprived Huynh of medical care with the willfulness, deliberation, and premeditation to murder her, and that the deprivation of medical care in fact caused her death.
 
 
 8
 Ainsworth did not take the stand. Bayles's testimony was to the effect that Ainsworth was totally responsible for the crimes committed, and that Bayles only accompanied him out of fear for his own life. Ainsworth's defense was that he was not Bayles's companion, but he was instead the hitchhiker picked up by Bayles and another man (the real killer) after Huynh had been murdered and her body disposed of. The jury convicted Ainsworth of first degree murder, found the special circumstances allegations of robbery and kidnapping to be true, and sentenced him to death. Bayles was found guilty of second degree murder.
 
 
 9
 The Supreme Court of California unanimously affirmed Ainsworth's conviction and sentence. People v. Ainsworth, 45 Cal.3d 984, 248 Cal.Rptr. 568, 755 P.2d 1017 (1988). After exhausting his available state court remedies, Ainsworth filed the instant habeas petition in federal district court. The district court denied relief to Ainsworth on all but his claim that defense counsel was ineffective for failure to elicit expert medical evidence that medical treatment for Huynh might have been futile, therefore the deprivation of medical care could not have constituted premeditated murder. The State appeals from this holding, while Ainsworth cross-appeals from the denial of relief on his other claims.
 
 ANALYSIS
 Standard of Review
 
 10
 We review de novo a district court's decision to grant or deny habeas corpus relief. We also review de novo any underlying state court conclusions of law. While we examine for clear error any factual findings made by the district court in reaching its decision, we must defer to state court findings of fact unless based on an unreasonable determination of the facts in light of the evidence presented.
 
 
 11
 Gallego v. McDaniel, 124 F.3d 1065, 1069 (9th Cir.1997) (internal citations, quotation, and brackets omitted).
 
 Discussion
 
 12
 I. The State's Appeal [96-99017]
 
 A. Controlling Law
 
 13
 The first question raised by the State is whether Title I of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA" or the "Act") governs our review of Ainsworth's habeas petition.[2] The Act does not apply to petitions pending at the time of the AEDPA's enactment unless the State meets certain conditions, e.g., appointment of postconviction counsel in state court proceedings. Lindh v. Murphy, --- U.S. ----, ----, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997); Jeffries v. Wood, 114 F.3d 1484, 1487, 1499 (9th Cir.1997) (en banc). Ainsworth's petition was pending at the time of the AEDPA's enactment, and California does not meet the conditions requisite for applying the provisions of the Act to Ainsworth. Accordingly, the Act does not govern our review of this petition.
 
 B. Ineffective Assistance
 
 14
 Before turning to the merits of the State's argument that the district court erred by finding Ainsworth's trial counsel to have been ineffective, we must dispose of a preliminary question. The State contends that the district court abused its discretion by admitting expert testimony on the question of ineffective assistance. Regardless of whether the district court should have admitted and considered the two attorneys' sworn declarations as being merely additional argument rather than expert opinions, the State's contention goes too far. See, e.g., Thompson v. Calderon, 109 F.3d 1358, 1364 (9th Cir.) (as amended) (noting, without criticizing, the district court's decision to allow the petitioner and the State to call "attorney expert witnesses to support their arguments regarding ineffective assistance of counsel"), cert. denied, --- U.S. ----, 117 S.Ct. 2426, 138 L.Ed.2d 188 (1997).[3] We find no abuse of discretion in the district court's ruling on this point.
 
 
 15
 The district court determined that Ainsworth's trial counsel provided ineffective assistance by his failure to prepare and present an adequate defense to the State's theory that Ainsworth murdered Huynh by denying her access to medical care. In order to prevail on this theory, the State had to prove that Ainsworth's restraint of Huynh was the proximate cause of her death, i.e., had she been released, medical personnel could have saved Huynh's life. Ainsworth contends that if defense counsel had investigated and presented the available medical evidence, the jury would have heard evidence that the gunshot wound in the pelvis could have been fatal, even though presumably not intended to be; therefore, any conduct barring access to medical care could not be a proximate cause of death and could not be the basis for a finding of premeditated murder.
 
 
 16
 We apply a two-prong test to determine whether trial counsel provided ineffective assistance. First, we examine the question of whether trial counsel's performance "fell below an objective standard of reasonableness ... under prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984). Second, we must determine whether there was resultant prejudice, i.e., whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068. Our review is highly deferential; we will not second-guess defense counsel's decisions, but must indulge a strong presumption that his conduct fell within the wide range of professionally competent assistance. Id. at 689-90, 104 S.Ct. at 2065-66.
 
 
 17
 The State argues that the district court erred by finding that Brian Christiansen, as defense counsel, failed to interview Dr. Joseph H. Masters, the pathologist who performed the autopsy and testified at trial on behalf of the State, and that this omission constituted a deficient performance.
 
 
 18
 Christiansen stated at his deposition that he recalled speaking with Dr. Masters at least once before trial. However, Christiansen could not recall where or when this conversation took place, nor could he remember what was discussed. Dr. Masters had no recollection of any such conversation, and Christiansen's own files contained no notes of or references to any meeting with Dr. Masters. While Christiansen testified that some of his files from the Ainsworth trial had been lost in the dozen or so years between the trial and his deposition, the district court found Dr. Masters to be more credible than Christiansen. The record therefore supports the district court's finding that Christiansen failed to interview Dr. Masters. We cannot say that the district court's finding of Christiansen's deficient performance in failing to conduct an interview of this witness was clearly erroneous.[4]
 
 
 19
 Strickland requires both a showing of a failure to meet professional standards of conduct and a showing of prejudice. Under the prejudice prong, the defendant carries the burden of demonstrating a reasonable probability that, absent counsel's errors, the jury would have a reasonable doubt respecting the verdict. Strickland, 466 U.S. at 695, 104 S.Ct. at 2068-69. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome" of the trial. Id.
 
 
 20
 The district court concluded that the post-trial declarations of Drs. Masters and Daugherty "contain powerful expert testimony undermining the prosecution's theory of special circumstances."[5] We reach the opposite conclusion. We have carefully reviewed the trial testimony of Dr. Masters and have compared it to the post-trial affidavits of Drs. Masters and Daugherty. The affidavits are consistent with and add no new evidence to the evidence that was already before the jury. It cannot be said that the failure to elicit this particular testimony rendered the result of the trial unreliable or the proceeding fundamentally unfair. See Lockhart v. Fretwell, 506 U.S. 364, 369, 113 S.Ct. 838, 842-43, 122 L.Ed.2d 180 (1993).
 
 
 21
 Specifically, the post-trial affidavits state at the outset that neither doctor could form an opinion or state with any medical certainty the time of death or whether Huynh could have been saved by medical care. Dr. Daugherty stated that he would have testified that there were four scenarios which, if present, would have resulted in a fatal, untreatable injury: (1) if the bullet severed a major blood vessel causing a rapid, massive blood loss; (2) if the bullet missed a major blood vessel, but caused widespread internal damage which would cause a slower but inevitable death from shock; (3) if the bullet severed intestines causing dispersion of fecal matter resulting in widespread, untreatable infection; and (4) a combination of both internal damage and severed intestines combining to produce an untreatable condition.
 
 
 22
 As the California Supreme Court pointed out, there was substantial nonmedical evidence that Huynh did not die quickly. People v. Ainsworth, 45 Cal.3d 984, 248 Cal.Rptr. 568, 755 P.2d 1017, 1041 (1988).[6] The question, therefore, is whether there is a reasonable probability that the jury would have reached a different conclusion (that Ainsworth's denial of Huynh's access to medical care was not the proximate cause of her death) if the jury had heard medical testimony specifically directed to Dr. Daugherty's remaining three scenarios: that Huynh possibly had a fatal, untreatable injury due to widespread internal damage resulting in shock, widespread internal infection, or a combination of both.
 
 
 23
 It is highly unlikely that the jury would have reached a different conclusion because the trial testimony of Dr. Masters is entirely consistent with the testimony in both post-trial affidavits. The trial transcript shows that Dr. Masters in fact testified extensively regarding the possibility that Huynh could have died from widespread internal damage, shock, or infection even if she had had access to medical care. The following excerpts are representative:
 
 
 24
 Q. [Prosecutor] Assuming none of the major vessels in that area were damaged, but that there was damage to some of the organs you've mentioned, how long could a person with this type of injury potentially survive?
 
 
 25
 A. For some long period of time and treatment certainly -
 
 
 26
 Q. Let's assume no treatment first.
 
 
 27
 A. It would depend on the degree of shock, the degree of rapidity of the developing of the infection that would have occurred from damage to the intestine or from other organs that would have been--other organs or tissues that would have been damaged, representing a focus of infection and the gut that was damaged releasing bacteria. It would depend on how fast the infection process proceeded.
 
 
 28
 Q. Well, at the outside parameter are we talking about a matter of minutes, hours, or what? Assuming no treatment?
 
 
 29
 A. It could have been days or longer.
 
 
 30
 * * * * * *
 
 
 31
 Q. Let's assume the facts we have here, this type of wound, assume that no major blood vessel was involved at the outset, that is no major blood vessel was involved that would cause death within a matter of seconds, minutes, would a person with this type of wound have the potential for being saved by reasonable, prudent medical treatment?
 
 
 32
 A. If a person sustaining this injury arrived at a place of medical care, not in irreversible shock, I think that the chances of surviving the injury would be reasonably good.
 
 
 33
 Q. And you talk about irreversible shock, what is that?
 
 
 34
 A. That's a state in which body, because of some injury or damage, has developed a loss of pressure on blood vessels, has developed other kinds of changes, that even though there may still be heartbeat and some breathing, so that there is some evidence that life exists, there has been a damage to the tissues so that no matter what kind of treatment one gets they will not survive.
 
 
 35
 * * * * * *
 
 
 36
 Q. [Cross-examination by Ainsworth's counsel] Since you cannot tell us in your opinion based upon your examination of the remains when the death occurred, is it fair to say that you cannot tell us where along that continuum that medical treatment would have resulted in the victim's living?
 
 
 37
 A. Other than in the context of the questions that have been previously asked, if the individual died as a result of massive bleeding which occurred very rapidly within seconds or minutes, then the probability of any kind of medical care being effective under those conditions is remote, that the chances are that the medical care would have had no effect if there had been a major blood injury resulting in sudden death.
 
 
 38
 If the individual had lived for several days, for a few days after sustaining injury it would imply at least that the extent of injury was somewhat less, and as long as the individual was in a reasonable state of consciousness it would have an implication that medical care might as well be effective in treating the patient, but I do not know at what point of time in this continuum the individual may have reached a state of infection, irreversible shock, that medical care would no longer have been effective.
 
 
 39
 * * * * * *Q. Injury, infection, shock, hemorrhage, those are the four things that you listed?
 
 
 40
 A. Yes.
 
 
 41
 Q. And is it fair to say of those four ingredients the only one that you were able to determine from your knowledge was the first one, namely the track of the wound?
 
 
 42
 A. No. The injury not only included the injury that I saw in the pelvis bones but included injury to other organs which were no longer present.
 
 
 43
 There was the amount of infection I could not determine because of the state of the body, and because I did not know whether or not the individual died immediately or lived for days. The amount of shock I cannot quantitate other than obviously at some point in time the individual died and was in a state of irreversible shock.
 
 
 44
 * * * * * *
 
 
 45
 Q. [I]f this person were to have lived five hours after the infliction of the wound, the gunshot wound, can you tell me, based upon your findings, at what point in time was the point of no return as far as that person receiving medical attention in that five-hour span to save the life?
 
 
 46
 A. Only by a qualification that it would depend at what point in time the various factors related to the injury developed to a position that were irreversible. It may well have been that some treatment just prior to the five hours might have been life saving if the individual had had massive blood loss, but showed some signs of life at a point in time, a half an hour after the injury. It may very well have been that--that the kind of injury that was present in the pelvis even at that time was not going to respond to treatment.
 
 
 47
 * * * * * *
 
 
 48
 Q. [L]et's assume she did live seven days, if you had been present during the entire time could you have pinpointed the point of no return as far as this person receiving medical care, failure of which would result in her death?
 
 
 49
 A. Again within some parameter and with some qualifications there was a point in time when both blood pressure or a shocked state occurred and anyone with medical training could have recognized that this was a state that was certainly dangerous and close to termination of the individual. There may have been other--there may have been a period of time before that when it would not have been apparent, even though there was a severe infection that might have resulted in death even if treatment had occurred.
 
 
 50
 The post-trial affidavits reiterate the critical medical fact before the jury in this case: the total absence of medical evidence, opinion or certainty as to when Huynh died and when, if ever, she could have been saved by treatment. Although the affidavits state the possible scenarios of untreatable conditions with somewhat more definition and particularity, Dr. Masters's testimony at trial covered the essence of these scenarios. The jury heard evidence that Ainsworth shot Huynh and thereafter ignored her pleas for help, treated her abysmally, and raped her. It is unlikely that the jury would reach a different result had it heard additional testimony that this egregious conduct denying Huynh of medical care was irrelevant because of the clinical possibility that Huynh's wound was untreatable and she would have died anyway, or that Huynh may even have been dead when raped.[7] Ainsworth's claim for relief based upon ineffective assistance of counsel therefore fails.
 
 
 51
 II. Cross-Appeal [96-99018]
 
 
 52
 Ainsworth raises several issues on his cross-appeal relating to his trial and conviction. He argues that (1) the trial court's denial of his motion for a change of venue deprived Ainsworth of his due process rights; (2) the trial court erred by admitting expert testimony about Bayles's credibility; and (3) the security arrangements at trial constituted a deprivation of Ainsworth's due process rights. The district court rejected these contentions, each of which will be discussed below.
 
 A. Change of Venue
 
 53
 Ainsworth argues that the district court erred by holding that the trial court's decision to deny his motion for a change of venue did not constitute a violation of his right to due process. Ainsworth contends that a change of venue was necessitated by the extensive pretrial publicity. We reject this contention.
 
 We recently declared that:
 
 54
 A criminal defendant facing trial by jury is entitled to be tried by a panel of impartial, indifferent jurors. Accordingly, a trial judge must grant a motion for change of venue if prejudicial pretrial publicity makes it impossible to seat an impartial jury. As we recently noted,
 
 
 55
 A defendant need only demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual. Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Prejudice is rarely presumed because "saturation" defines conditions found only in extreme situations. To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside.
 
 
 56
 United States v. Sherwood, 98 F.3d 402, 410 (9th Cir.1996) (as amended) (internal citations and quotations omitted).
 
 
 57
 Gallego v. McDaniel, 124 F.3d at 1070 (most internal citations and quotations omitted).
 
 1. Presumptive Prejudice
 
 58
 Among the factors to be considered in a presumed prejudice argument is whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge ... wave of public passion." Patton v. Yount, 467 U.S. 1025, 1033, 104 S.Ct. 2885, 2889-90, 81 L.Ed.2d 847 (1984) (citations and internal quotations omitted). An additional factor is whether the media accounts were primarily factual, as such accounts tend to be less prejudicial than inflammatory editorials or cartoons. See Harris v. Pulley, 885 F.2d 1354, 1362 (9th Cir.1988). A final factor is whether the media accounts contained inflammatory, prejudicial information that was not admissible at trial. See Sheppard v. Maxwell, 384 U.S. 333, 360-61, 86 S.Ct. 1507, 1521-22, 16 L.Ed.2d 600 (1966).
 
 
 59
 Most of the media reports were published between the time of Huynh's disappearance and Bayles's confession. A brief resurgence of media coverage occurred at the time of Ainsworth's arrest, but after May 1979 there was only one report that Ainsworth's trial had been scheduled. As the venire was not convened until several months later, in the fall of 1979, it cannot be said that there was anything remotely approaching a barrage of inflammatory publicity immediately prior to Ainsworth's trial.
 
 
 60
 The media accounts of the crime and Ainsworth's arrest were factual in nature. Indeed, Ainsworth failed to identify any editorials or other opinion pieces speculating about his guilt. To the extent any of the information printed was prejudicial (e.g., characterizing Huynh as a sympathetic victim, describing Ainsworth's criminal record, etc.), it was printed several months before trial. Such information is not presumptively prejudicial. See Harris, 885 F.2d at 1362; see also Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800-01, 49 L.Ed.2d 683 (1976).
 
 
 61
 In light of the above, we agree with the district court's conclusion that there was no showing of presumptive prejudice.
 
 2. Actual Prejudice
 
 62
 Ainsworth argues that he suffered actual prejudice because the voir dire at his trial was inadequate and failed to remove jurors who could not disregard news reports about the crime. See Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961) (mere exposure to news accounts of a crime does not, without more, rebut the presumption that jurors are impartial; "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court"). We reject this contention.
 
 
 63
 With respect to the first point, Ainsworth contends that the voir dire was inadequate because the trial court did not follow some of the directives found in the ABA Standards for Criminal Justice (2d ed.1980). The Supreme Court has flatly rejected this line of argument. See Mu'Min v. Virginia, 500 U.S. 415, 424-25, 430, 111 S.Ct. 1899, 1904-05, 1907-08, 114 L.Ed.2d 493 (1991).
 
 
 64
 As for the second point, we note that, of the ninety-five prospective jurors questioned by the court and lawyers, only three had developed opinions about the crime based on information obtained from sources other than the news media, and five others admitted that they had developed an opinion about Ainsworth's guilt from reading news accounts of the crime and could not listen to evidence at trial with an open mind. The proportion of the venire who admitted to a disqualifying prejudice is well below other percentages found acceptable. See, e.g., Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037-38, 44 L.Ed.2d 589 (1975) (excusing twenty of seventy-eight persons in venire acceptable); Harris, 885 F.2d at 1364 (excusing nineteen of 103 persons in venire acceptable).
 
 
 65
 Ainsworth also argues that he was actually prejudiced by juror Saldana, who indicated during voir dire that she was unsure whether she could disregard the information she had gathered from news sources and decide the case based only on the evidence presented at trial. We disagree with Ainsworth's reading of juror Saldana's colloquy with the court. There is no indication that she had the opinion that Ainsworth was the murderer, and she repeatedly stated she could set aside her feelings of sympathy for Huynh in order to judge the case fairly. Finally, the trial court, which was able to observe juror Saldana's demeanor, found that she could be impartial. That determination is presumed to be correct, and we find nothing in this record that undermines the presumption. See Harris, 885 F.2d at 1361.
 
 B. Expert Testimony
 
 66
 Ainsworth next contends that the district court erred in rejecting his claim that the trial court improperly admitted the testimony of Dr. Captane Thompson, a psychiatrist, as expert credibility testimony favorable to Bayles's defense. We may not decide whether Dr. Thompson's testimony was properly admitted under California law. See Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475, 479-80, 116 L.Ed.2d 385 (1991). We may, however, consider Ainsworth's related claims that the trial court's decision violated his due process rights by (1) producing a fundamentally unfair trial setting, and (2) had the effect of usurping the jury's role as factfinder.
 
 
 67
 With respect to these two constitutional questions, Ainsworth cites to no decision from the Supreme Court of the United States or from the Ninth Circuit holding that the admission of expert credibility testimony violates a defendant's due process rights. Indeed, Ainsworth concedes that there was no precedent so holding at the time his conviction became final. Because "the result [Ainsworth seeks] was not dictated by precedent existing at the time [his] conviction became final[,]" Teague v. Lane, 489 U.S. 288, 301, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334 (1989) (emphasis in original), we would be announcing a new rule of constitutional law on collateral review if we were to adopt Ainsworth's line of argument.
 
 
 68
 Ainsworth's claims are therefore barred unless one of two conditions is met: either (1) "the rule places a class of private conduct beyond the power of the State to proscribe ... or addresses a substantive categorical guarantee accorded by the Constitution"; or (2) the rule announces a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Graham v. Collins, 506 U.S. 461, 477-78, 113 S.Ct. 892, 902-03, 122 L.Ed.2d 260 (1993) (internal citations and quotations omitted).
 
 
 69
 Effectively conceding that the first condition is not met, Ainsworth focuses his argument on the second, insisting that the rule he proposes would create a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of criminal proceedings. See id. We disagree.
 
 
 70
 Watershed rules are "so central to an accurate determination of innocence or guilt, [it is] unlikely that many such components of basic due process have yet to emerge." Teague, 489 U.S. at 313, 109 S.Ct. at 1077. Moreover, the exception is "meant to apply only to a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty." Graham, 506 U.S. at 478, 113 S.Ct. at 903 (internal quotations omitted). An example of such a rule is that of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), which provides that a defendant charged with a serious criminal offense has the right to appointed counsel. See Saffle v. Parks, 494 U.S. 484, 495, 110 S.Ct. 1257, 1263-64, 108 L.Ed.2d 415 (1990).
 
 
 71
 We find it highly unlikely that the Supreme Court would accept Ainsworth's contention that a new rule excluding expert credibility testimony would qualify as a watershed rule. Allowing expert credibility testimony is not likely to cause an inaccurate determination of guilt or innocence, and Ainsworth has failed to show how the new rule he seeks would protect against a usurpation of the jury's role. Accordingly, we reject this argument.
 
 C. Security Arrangements
 
 72
 Ainsworth's final contention is that the district court erred by holding that the security arrangements at his trial did not violate his constitutional right to due process. Specifically, Ainsworth argues that the number and placement of armed guards in the courtroom was highly prejudicial to him and deprived him of a fair trial. We disagree.
 
 
 73
 Our review of security arrangements is very limited:
 
 
 74
 All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.
 
 
 75
 Holbrook v. Flynn, 475 U.S. 560, 572, 106 S.Ct. 1340, 1347-48, 89 L.Ed.2d 525 (1986).
 
 
 76
 There were generally four, and occasionally six, armed sheriff's deputies present at the trial. When six deputies were present, two were posted at the entrance doors to the courtroom. At all times throughout the proceedings, one deputy sat behind Bayles and at least one sat behind Ainsworth.[8]
 
 
 77
 The jury could reasonably infer that, when six deputies were present in the courtroom, the two posted at the entrance doors to the courtroom were "there to guard against disruptions emanating from outside the courtroom[.]" Id. at 569, 106 S.Ct. at 1346 (emphasis added). As for the remaining deputies, the ratio of guards to defendants was 2:1, with no more than two deputies positioned behind Ainsworth. On these facts, we find nothing inherently prejudicial in the security arrangements for two defendants charged with capital murder. See King v. Rowland, 977 F.2d 1354, 1358 (9th Cir.1992) (upholding ratio of three armed guards to single defendant).
 
 CONCLUSION
 
 78
 With respect to the State's direct appeal [96-99017], the district court's grant of partial habeas relief on the issue of ineffective assistance of counsel is REVERSED. As for Ainsworth's cross-appeal [96-99018], the district court's denial of relief on all of Ainsworth's remaining claims is AFFIRMED.
 
 
 
 [1]
 Under the provisions of Cal.Penal Code § 190.2 applicable in this case, the jury's discretion to impose the death penalty was limited to those cases of first degree murder presenting one or more of several enumerated "special circumstances." The "special circumstances" included an intentional murder during the commission or attempted commission of certain felonies, including robbery, kidnapping, and rape. See People v. Green, 27 Cal.3d 1, 164 Cal.Rptr. 1, 30, 609 P.2d 468, 497 (1980). Under later amendments to § 190.2, an intent to kill is no longer an element of felony-based special circumstances if the defendant is the actual killer. Cal.Penal Code § 109.2(b)(c); see People v. Anderson, 43 Cal.3d 1104, 240 Cal.Rptr. 585, 604-05, 742 P.2d 1306, 1325 (1987)
 Ainsworth was also charged with a third special circumstance of rape. This allegation was dismissed on the district attorney's motion at the preliminary examination.
 
 
 [2]
 See Pub.L. No. 104-132, §§ 101-107, 110 Stat. 1214, 1217-26 (Apr. 24, 1996), amending 28 U.S.C. §§ 2244 and 2253-55, and further codified at 28 U.S.C. §§ 2261-66
 
 
 [3]
 The decision in Thompson v. Calderon was vacated on the question of whether to recall the mandate. Thompson v. Calderon, 120 F.3d 1045 (9th Cir.) (en banc), cert. granted, --- U.S. ----, 118 S.Ct. 14, 138 L.Ed.2d 1037 (1997)
 
 
 [4]
 Citing Harris v. Pulley, 885 F.2d 1354 (9th Cir.1988), the State argues that the district court should have conclusively presumed that Christiansen interviewed Dr. Masters. We disagree. We held in Harris that the failure of defense counsel to recall whether he considered introducing particular evidence did not, in and of itself, overcome the strong presumption that his failure to introduce that evidence at trial fell within the range of reasonable professional assistance. Id. at 1368. Those facts are the reverse of the situation presented here
 
 
 [5]
 The district court further stated, "Specifically, both declarations list and describe three specific circumstances other than the severing of a major blood vessel which could have resulted in a necessarily fatal injury. [footnote omitted]." The term "special circumstances" as used in this case refers to the statutory charges of kidnapping and robbery committed in conjunction with an intentional murder. The term "special circumstances" should not be confused with the district court's recitation of the three or more "specific circumstances" of Huynh's bullet wound which could have caused the wound to be necessarily fatal
 
 
 [6]
 The California Supreme Court stated:
 [A] number of evidentiary matters pointed to the conclusion that the victim did not die immediately from the gunshot wound to her hip but remained alive for some time during the car ride. First, the fact that the victim was seated upright between the two codefendants when they drove out of the parking lot supports the theory that she was alive at that time. Second, the fact that no blood was found on the front seat--where the victim was seated at that time--clearly makes it less likely that the gunshot had severed a major blood vessel and had brought about the victims's death within seconds or minutes of the shooting; rather, the absence of blood on the front seat and its presence in other areas of the car--the rear seat and the trunk--support the theory that the victim survived for some period of time during the trip. Third, the fact that the victim's bra and purse had been discarded from the car in Oregon could reasonably lead the jury to believe that the items were removed from the victim at that time, most probably in the course of a sexual assault. Finally, the fact that the victim's body was almost entirely disrobed when it was found by the police would provide an additional basis for the jury to draw an inference that the victim was sexually attacked during the course of the car trip. If the jury concluded, from the above evidence, that the victim had indeed survived for a substantial period of time during the car trip, it could also infer that, since defendant obviously knew of the victim's injury, he had--by continuing to keep her captive--knowingly and intentionally deprived her of access to medical care while she bled to death.
 
 
 [755]
 P.2d at 1041
 
 
 [7]
 In his post-trial affidavit, Dr. Masters stated that if questioned at trial, he would have testified that if Huynh had been raped, this would not mean that she was alive at the time and could have been saved by medical care. The magistrate, in his findings and recommendations to the district court, observed that it "hardly would have served petitioner's cause in any way" to suggest necrophilia did not contribute to her death
 
 
 [8]
 A second sheriff's deputy sat behind Ainsworth at least once