Milton Tony GREENE, Petitioner–Appellee,

v.

I.C. Haunani HENRY, Warden, Respondent–Appellant.

No. 01–15938.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 11, 2002.

Filed Sept. 11, 2002.

David A. Lowe (briefed), Deputy Attorney General, David Andrew Eldridge (argued), Deputy Attorney General, Sacramento, CA, for the appellant.

Wesley Andrew Van Winkle, Berkeley, CA, for the appellee.

Before RYMER, KLEINFELD and McKEOWN, Circuit Judges.

## OPINION

KLEINFELD, Circuit Judge.

This case involves a petition for a writ of habeas corpus based on ineffective assistance of counsel.

### I. Facts

The facts in this case are extremely difficult to ascertain. Milton "Tony"

Greene was convicted of two counts of forcible oral copulation, foreign object rape, and rape.[1] But Sherry Esposto, the purported victim, testified that he did not rape her, that he was her fiancé and lived with her, and that their sexual activities on the occasion at issue were entirely consensual. The evidence of the rape consisted of her prior account, to the police and a nurse practitioner, alleging that he and his companions forced various sexual activities on her against her will. She testified in Greene's trial that she had developed a sexual relationship with another man and that she was jealous of her fiancé because she suspected him of sexual relationships with other women, so she had wanted to harm him by lying about him to the police. The case turned on whether her original story or her recantation at trial was a lie, or both were lies, or the truth was unascertainable so that the jury ought to have had a reasonable doubt.

Here is the evidence that Greene did in fact rape Esposto. A man named Devin "Chris" Brown[2] had recently moved in with a friend downstairs from Esposto. She testified that she had developed a sexual relationship with him. (He was impeached by evidence that he was on probation for selling crack). He testified that while he was in Esposto's apartment, Greene and two other men, Angelo Bird and William "Junior" Collins, came in and began forcing her to perform sexual acts. Esposto mimed making a telephone call and silently mouthed at "Chris" that he should call the police. Bird brandished a knife, and Esposto was forced to announce that she was a "ho for Tony." "Chris" testified that at one point Esposto said, "I

---

1. All three crimes were charged under an "in concert" theory, pursuant to Cal. Pen.Code §§ 264.1 and 288a(d).

2. Devin Brown is called "Chris" in Esposto's and the police officers' testimony. We put

"Chris" in quotation marks, because he testified that the reason he told people his name was "Chris" was, "I don't like telling people my name."

don't want to do this." He left and called 911. The police came and observed that Esposto was wearing only a tank top undershirt, was crying hysterically, was breathing hard and fast, vomited, had a red mark on her cheek as though she had been hit, and gave them an account of rape and other sex crimes. She told them that Greene and Bird (who brandished a knife) had forced her to perform fellatio on Bird and Collins while Greene fingered her vagina and made her submit to vaginal intercourse. The police brought her to a hospital where a nurse practitioner examined her for evidence of rape, and noted tenderness around her face and lower abdomen. The motive for Greene's rape, as the police understood it from Esposto's account, grew out of a robbery. When she got home that day, her apartment had been burglarized. A stereo, a lot of CDs, a leather jacket, and other property, largely Greene's, were taken. As she originally told the story to the police, Greene accused her of complicity in the burglary, told her she would have to "ho" for him, and made her perform the various sexual acts as revenge for her causing his property to be taken.

And here is a summary of Esposto's testimony at trial, which made out the case that Greene committed no crime. The reason she had been out when the apartment was burglarized was that she had been arrested for drunk driving the night before. When she discovered the burglarized apartment, she went downstairs to seek solace from her new friend, "Chris," about the burglary. He accompanied her back upstairs and stayed while she called the police and spoke to the responding officers. After "Chris" left, Greene came home, with his friends Bird and Collins. "Chris" wasn't there while Greene was there, and she didn't mime and mouth that he should call the police. Earlier that day, she had told him that he should call the police if it sounded as though they were violent, because they not infrequently were: she testified that she had had Greene arrested for domestic violence, she said she had previously hit him in the head with a hot Corning Ware pan (and then lied to the police and said Greene had hit her with it), and she had previously tried to shoot him.

She took Greene into the bedroom to discuss the burglary, and she harangued him about bringing Bird into their house, screaming loud enough so that "Chris" would hear. She strongly disliked Bird, because she believed he was "coming between [her] relationship with Milton Greene." Then, she testified, she and Greene resolved their argument by having consensual sexual intercourse in the bedroom. After they finished having sex, she testified that Collins came into the bedroom and told them that Bird had left. She then testified that the three of them "discussed having ... sexual intercourse together." When asked what happened next, she testified, "We consented." At some point (for "no reason"), they moved to the front room, and she performed fellatio on Collins while Greene penetrated her digitally. Nobody made her—she volunteered. Her testimony made it clear that she regularly had sexual relations with a number of men. For example, asked who the father of her child was, she testified, "We actually don't know, but Patrick MacKenzie claims her." Her testimony that she had previously had sex with one man while another watched made her story of consensual group sex more believable.

At trial, Esposto said that the reason she cried hysterically when the police came is that they forced her fiancé Greene to the floor and held a gun to his head. She was breathing hard and fast because of her anxiety that they might shoot Greene, which brought on an asthma attack. And the reason she vomited was all the alcohol

she had consumed. When asked why, if she was so concerned about Greene, she would then accuse him of rape, she at one point stated that she was intoxicated, and at another that she was "in a tie between leaving Milton for Chris [Devin Brown]," and that she thought "that this was a chance to just let go of everything between me and Milton." However, when asked why she would want to get Bird in trouble, she related that she did not like him. When asked if she was concerned about protecting her relationship with Milton Greene, she confusingly responded, "Yeah." As to Collins, she testified that she had nothing against him. When asked why she would want to put him in jail, she stated, "I didn't know what I wanted." Despite this highly equivocal evidence that Greene had committed the crimes, the jury convicted.

## II. Post-trial Proceedings

Greene unsuccessfully moved for a new trial on the ground that he received ineffective assistance of counsel and then appealed his conviction to the California Court of Appeal. After losing there, he petitioned for review by the California Supreme Court, but that petition was denied. Next, he filed a writ of habeas corpus in federal court. The magistrate judge recommended denial. The district judge remanded for an evidentiary hearing. The magistrate judge heard the evidence of ineffective assistance, made findings of

fact, and again recommended denial. The district judge rejected the recommendation and granted the writ. The respondent appeals.

■ In his petition for a writ of habeas corpus in the district court (prepared by counsel, not pro se), Greene makes the following claims,[3] relating to his general claim that his trial lawyers rendered ineffective assistance:

1. Counsel didn't do much preparation; he did not conduct an interview of Greene until three days before trial, made no investigation of the purported-victim, Sherry Esposto, or Devin "Chris" Brown, and failed to obtain the relevant medical reports;

2. Had he investigated, counsel would have discovered witnesses that would testify that Esposto had had prior asthma attacks that made her turn red and cry, that she wanted to punish Greene for infidelity, that she had admitted lying to the police about the rape, and that she had previously engaged in consensual group sex; and

3. Counsel didn't put on any witnesses, but merely cross examined the government's witnesses.

### A. California Court of Appeal Determination

The highest state court to have discussed these claims of ineffective assistance was the California Court of Appeal,

---

**3.** Greene argued, in his papers submitted to the magistrate judge, three additional claims of ineffective assistance: (1) trial counsel should have called Criminalist Mary Hansen as a witness to testify that she found no semen or saliva on Greene's or Collins's penises, and couldn't determine whose semen it was that she found in Esposto's vagina; (2) trial counsel should have argued that Devin "Chris" Brown was lying, based on inconsistencies in the police report, to support an argument that Brown was not present at the time of the rape; and (3) trial counsel should have inves-

tigated and found evidence to prove that Esposto's slap mark on her face was from a few days before. These claims were not made in state court, so had they been made in the federal habeas petition, they would have made it a mixed petition, and could not have been considered. *Rose v. Lundy*, 455 U.S. 509, 510, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Pappageorge v. Sumner*, 688 F.2d 1294, 1294 (9th Cir.1982). However, since they were not made in the federal petition, we need not consider them.

so we consider its determination. The state appellate court assumed for the purpose of its discussion that the evidence in question would have been admissible and that ineffectiveness was established from trial counsel's meager preparation. Despite assuming ineffective assistance for purposes of analysis (it made no finding to that effect), the state appellate court determined that no prejudice resulted from the alleged short-comings. Specifically, it held that there was no prejudice from the failure to investigate, discover, and put on witnesses to prove that Sherry Esposto was a liar, because "the jury was well aware Sherry was a liar due to her two inconsistent stories, only one of which could be true...." And it held that there was no prejudice from failure to investigate, discover, and put on witnesses to prove that Sherry Esposto had engaged previously in consensual sexual activities involving more than one person at a time, because

> [t]he jury also was aware from Sherry's testimony that she was sexually adventurous as she admitted having had sex previously in Collins's presence although not with him, having sex with Greene the first day she met him, not knowing who is the father of her child, having sex with Brown soon after meeting him and while she was involved with Greene, and having sex with Brown after returning from the rape examination following the charged sex acts.

Testimony to previous instances of group sex, the court reasoned, would not have added such corroboration to her trial account of her sexual activities as to make it "reasonably probable" that the verdict would have been different. The California Court of Appeal determined that the evidence that Greene's new lawyer claimed his trial lawyer should have discovered and put on did not "discredit, contradict, or negate critical damaging evidence presented by the prosecution." The California

Court of Appeal explained the conviction as resulting, not from testimony by Sherry Esposto that ought to have been impeached (she, after all, testified that Greene *didn't* commit the crimes), but rather from (1) the observations of the arresting officers and examining nurse practitioner detailing that Esposto said she'd been raped, her physical appearance at the scene and demeanor then and at the hospital, the apparent injury to her face, and the tenderness on examination, all of which was consistent with rape, (2) Esposto's inability to explain why, if she'd been making up the accusations because she was mad at Greene for seeing other women, she also would have falsely accused William "Junior" Collins, and (3) the inconsistency of Esposto's testimony both that she had her asthma attack because she was concerned for Greene's safety and also that she falsely accused Greene of a felony because she was so angry at him.

### B. Magistrate Judge's Findings

The magistrate judge held an evidentiary hearing. Greene's trial lawyer testified that he didn't look for Devin "Chris" Brown, because the prosecutor had not found him, and if no one found him, and he did not testify, the case would likely be dismissed. The prosecutor found him at the last minute. Even if trial counsel had found "Chris" and talked to him, the magistrate judge didn't see what he could have done that would have helped Greene.

The magistrate judge took testimony from the witnesses who Greene's new lawyer said would have shown that Esposto was jealous, had threatened that she would make false reports to the police against Greene, had said that she'd send him to prison, and so forth. The magistrate judge made a finding of fact that the demeanor of these witnesses showed that they were trying to "help out an old friend/relative" and that their demeanor ("giggling in the back of the courtroom during testimony of

others," "obvious friendship with petitioner," and "glances at petitioner during testimony") showed "an attitude of not taking their oath to tell the truth all that seriously." The magistrate judge noted that, although the new witness who was supposed to corroborate the asthma story to explain Esposto's crying and breathlessness had told the investigator that Esposto used an inhaler, she " 'forgot to remember' her previous statement" and testified before the magistrate judge that she didn't remember seeing Esposto use an inhaler. Thus the magistrate judge made a finding of fact that "the 'friends' testimony would appear contrived to a large degree."

### III. Analysis

■ We review the district court's decision to grant habeas corpus relief *de novo.*[4] Under the AEDPA, we are required to "defer to state court findings of fact unless based on an unreasonable determination of the facts in light of the evidence presented" in the state court proceedings.[5] And we are required to defer to the state court's decision and may reverse it only if that decision is "contrary to, or involved an unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States.[6] The statutory requirement of unreasonableness demands more than that the state court be mistaken; its error must be "clear."[7] That is,

> our independent review of the legal question does not merely allow us ultimately to conclude that the petitioner has the better of two reasonable legal

arguments, but rather leaves us with a 'firm conviction' that one answer, the one rejected by the court, was correct and the other, the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred.[8]

Petitioner argues that the state court determination was an unreasonable application of *Strickland v. Washington,*[9] because the newly presented testimony demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[10] We cannot agree. The state court's reasons make perfect sense to us.

■ As to the testimony that would have shown Sherry Esposto to be someone who lied, was jealous, sought to get Greene in trouble out of jealousy, and had admitted lying about the rape, trial counsel didn't need witnesses to testify to this. Sherry Esposto testified to all of this. True, the new evidence would have corroborated her trial testimony. And we agree with petitioner's argument that mere cumulativeness does not necessarily mean that evidence would have made no difference. Frequently in a criminal trial, a prosecution witness says one thing, a defendant another, and the jury is likely to disbelieve the defendant unless he is corroborated. But here the unlikelihood that the testimony would matter is not merely that it was cumulative. It is that Sherry Esposto did not need impeaching. She fully and effectively impeached herself. None of the evidence that petitioner says

4. *Zitto v. Crabtree,* 185 F.3d 930, 931 (9th Cir.1999).

5. *Ainsworth v. Calderon,* 138 F.3d 787, 790 (9th Cir.1998), *amended at* 152 F.3d 1223.

6. 28 U.S.C. § 2254(d)(1).

7. *Van Tran v. Lindsey,* 212 F.3d 1143, 1153–54 (9th Cir.2000).

8. *Id.*

9. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

10. *Id.* at 669, 104 S.Ct. 2052.

trial counsel should have put on contradicted any prosecution evidence.

What's more, even had trial counsel come up with the witnesses his new lawyers say he should have, their testimony was as likely as not to harm his case. As for trial counsel's not putting on any witnesses, who? To testify to what? And most important, why? The case was already as good as it was going to get—the rape "victim" testifies that she wasn't raped, the corroborating witness is a crack dealer, who lies even about his own name, with a motive to keep Greene in jail (he had developed a sexual relationship with Greene's fiancée), and the medical evidence was weak. It doesn't get much better than that from a defense lawyer's point of view.

The prosecution's case at trial centered on Brown's 911 call and his testimony, as well as the police report, about Esposto's hysterical reaction at the time. Brown, a reluctant witness, testified and corroborated much of Esposto's original report to the police. Nothing testified to by the new witnesses would have undercut this evidence at all. Nor would it have undermined the physical evidence. While the new witnesses may have supported Esposto's trial testimony to some extent, they would also have strongly impeached her character and general credibility thereby making the prosecution's task easier. This is what the state trial judge found, having sat through the proceedings and reviewed the evidence Greene presented in his post-trial motion.

Had trial counsel put on a bunch of witnesses "whose testimony would appear contrived," as the magistrate judge delicately put it, that would have made it a lot easier for the jury to convict. A jury could be expected to reason that the defense wouldn't have put on a bunch of lies if the truth would set the defendant free. Even had his lawyer done ten times the work,

petitioner has not demonstrated a "reasonable probability" that it would have mattered to the outcome.

As for corroborating Sherry Esposto's testimony that she had an asthma attack as a result of the arrest of Greene, rather than as a result of sexual trauma, Greene's new witness to her previous use of an inhaler, Ebony Pipkin, "forgot to remember" it, as the magistrate judge put it, and testified under oath that she'd never seen Esposto use an inhaler when she lived with her.

Petitioner argues, in line with the district court's analysis, that testimony from the new witnesses would have undermined Esposto's image as a "sympathetic victim of abuse." But her own testimony already effectively undermined any such image, far better than testimony by witnesses that "would appear to be contrived" could. As the state court found, Sherry Esposto's testimony established that she *had to be* a liar, because it conflicted squarely with what she had told the police. Besides her own testimony, which painted her as what the state court delicately labeled "sexually adventurous," her testimony that she had previously hit Greene with a pan and then lied to the police and said he'd hit her, her testimony that she tried to shoot Greene, her testimony that she had wanted Greene to know that she could put him in jail if he had relations with other women (even as she testified that she had formed a sexual relationship with Devin "Chris" Brown), and her testimony that she didn't know who had fathered her own child, fully established that she was not a "sympathetic victim of abuse."

As for her prior group sex experiences, to which Pipkin (the witness who "forgot to remember" the asthma inhaler) and several other witnesses testified before the magistrate judge, even that testimony was perhaps inconsistent. One of the witnesses said they'd had group sex in a Jeep,

and another supposed participant didn't recall "anything unusual." Even if it came into evidence, it is hard to see how it could prove consent more effectively than Esposto's own testimony, taken with her history as it came into evidence, that she had in fact consented. Testimony that she had engaged in "group sex" would not have added much to Sherry Esposto's own testimony that she had previously had consensual sex with one man while another watched, and with both men together on the occasion at issue. Nor did her testimony that she did not know who had fathered her child imply that she was of chaste disposition. No matter how "sexually adventurous" she was, she was entitled to have her adventures, without coercion, and not to be raped. The question was not whether she was chaste, but whether she was raped, and this evidence would have had little bearing on that question.

The decision of the district court is REVERSED. The case is remanded with instruction to vacate the writ.