**Somphalavanh SOPHANTHAVONG, Petitioner–Appellant,**

v.

**Joan PALMATEER, Superintendent, Respondent–Appellee.**

### No. 02–35922.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 2003.

Filed April 12, 2004.

Amended Aug. 3, 2004.

Barbara L. Creel, Assistant Federal Public Defender, Portland, OR, for the petitioner-appellant.

Timothy A. Sylwester, Assistant Attorney General, Salem, OR, for the respondent-appellee.

Before ALARCÓN, FERGUSON, and RAWLINSON, Circuit Judges.

Opinion by Judge Alarcón; Dissent by Judge Ferguson

ALARCÓN, Circuit Judge.

Somphalavanh Sophanthavong appeals from the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mr. Sophanthavong contends that the district court erred in denying his claim that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments when his trial counsel (1) misrepresented the applicability of Oregon's "Second Look" statute to his sentence; (2) failed to explain that his guilty plea required him to stipulate to a departure sentence greater than the presumptive sentence; and (3) erroneously advised him that he could be convicted of aggravated murder and face a sentence of thirty years.

We affirm because Mr. Sophanthavong has failed to prove that the state court's decision was contrary to or an unreasonable application of federal law, or based on an unreasonable determination of the facts in light of the evidence presented.

## I

On August 1, 1994, at the age of sixteen, Mr. Sophanthavong participated in a burglary and robbery. During the burglary and robbery, the victim was killed. The State charged Mr. Sophanthavong with aggravated murder, murder, first-degree robbery, and first-degree burglary. The State filed a motion requesting that the juvenile court waive jurisdiction over Mr. Sophanthavong and transfer him to the state circuit court to stand trial as an adult.

At the outset of the juvenile court hearing, Mr. Sophanthavong's counsel made the following judicial admission:

my client is of sufficient sophistication and maturity to appreciate the conduct of his behavior. I don't think the Court's going to hear anything from any of the people that actually know [Mr. Sophanthavong] his court counselor, Pati Archuleta, and Dr. Orin Bolstad, who

did an evaluation in this case—that there's anything to suggest otherwise. In fact, what the Court will hear from Dr. Bolstad is that we have an individual who's of average intelligence, who has no major psychological issues that will impair treatment, or certainly suggest that he lacks the sufficient maturity and sophistication.

The Oregon statute in force at the time of the juvenile court hearing set forth four factors to consider in waiving a youth to an adult court:

(1) The youth is 15 years of age or older at the time of the commission of the alleged offense;

(2) The youth, except as otherwise provided in ORS 491C.364 and 419 C.370, is alleged to have committed a criminal offense constituting:

(a) Murder under ORS 163.115 or any aggravated form thereof;

. . .

(3) The youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved; and

(4) The juvenile court, after considering the following criteria, determines by a preponderance of the evidence that retaining jurisdiction will not serve the best interests of the youth and of society and therefore is not justified:

(a) The amenability of the youth to treatment and rehabilitation given the techniques, facilities and personnel for rehabilitation available to the juvenile court and to the criminal court which would have jurisdiction after transfer;

(b) The protection required by the community, given the seriousness of the offense alleged;

(c) The aggressive, violent, premeditated or willful manner in which the offense was alleged to have been committed;

(d) The previous history of the youth, including:

(A) Prior treatment efforts and out-of-home placements; and

(B) The physical, emotional and mental health of the youth;

(e) The youth's prior record of acts which would be crimes if committed by an adult;

(f) The gravity of the loss, damage or injury caused or attempted during the offense;

(g) The prosecutive merit of the case against the youth; and

(h) The desirability of disposing of all cases in one trial if there were adult co-offenders.

Or.Rev.Stat. § 419C.349 (2001).

During the evidentiary hearing, the court heard the testimony of James Bridges, the assistant principal at David Douglas High School. Mr. Bridges testified that Mr. Sophanthavong was one of his students. Mr. Bridges stated that Mr. Sophanthavong "was an honor roll student his freshman year, 3.5 GPA, which is a B-plus average."

In his junior year, however, because of "strings of absenteeism," his grades plummeted. Ultimately, he withdrew from the school. Mr. Bridges referred Mr. Sophanthavong to an alternative high school because of his numerous absences and behavior problems. In the referral letter, Mr. Bridges described him as a "[v]ery bright young man who needs a new direction." On cross-examination, Mr. Bridges testified that Mr. Sophanthavong "has the intellectual skills to be able to exist in a structured educational environment."

After the close of evidence, Mr. Sophanthavong's counsel stated: "Sophistication and maturity. The Court heard the evidence. I'm not going to argue that point."

Instead, defense counsel argued that the State failed to meet its burden of proving, as required under the fourth factor set forth in ORS § 419C.349 (2001), that retaining juvenile court jurisdiction was not in the best interest of his client. The juvenile court granted the State's motion to waive juvenile court jurisdiction.

Mr. Sophanthavong appealed the order of the juvenile court granting the State's motion to waive juvenile court jurisdiction. The only issue raised in the appeal was whether the juvenile court erred in finding that it was in the best interest of the child and society that the juvenile court waive its jurisdiction and transfer the child to the adult criminal court. Mr. Sophanthavong's brief noted that "[i]n this case the child did not dispute that the first three elements [of Or.Rev.Stat. § 419C.349] were met."

The Court of Appeals of the State of Oregon affirmed the juvenile court's order without opinion. The Supreme Court of the State of Oregon denied Mr. Sophanthavong's petition for review without opinion.

Mr. Sophanthavong was indicted on December 19, 1994 as an adult and charged with aggravated murder, two counts of felony murder, intentional murder, robbery in the first degree, and burglary in the first degree.

At the time Mr. Sophanthavong was indicted, Oregon's Felony Sentencing Guidelines prescribed a presumptive sentence of 120 to 121 months and a maximum sentence of 242 months for felony murder. Aggravated murder was a capital offense, but because Mr. Sophanthavong was a minor, the prescribed sentence for a conviction of aggravated murder was life imprisonment with a minimum sentence of thirty years.

Mr. Sophanthavong entered into an agreement with the District Attorney's Office of Multnomah County, Oregon to plead guilty to felony murder on the condition that the sentence would be 180 months. He was represented by Gary B. Bertoni. Mr. Sophanthavong also agreed to testify against his co-defendants in exchange for a dismissal of the five remaining charges. Mr. Sophanthavong personally signed the agreement, and submitted a petition to plead guilty to the circuit court.

A change of plea hearing was originally set for June 21, 1995. It was rescheduled for the following week to give Mr. Sophanthavong more time to consider his plea. On June 29, 1995, Mr. Sophanthavong appeared in court to enter his plea of guilty. When the court asked Mr. Sophanthavong if the plea was made voluntarily and if anyone forced him to plead guilty, Mr. Sophanthavong replied, "No, it was made voluntarily, sir." The court then stated, "You know you don't have to do it. You know you can go to trial?" Mr. Sophanthavong responded, "Yes."

Thereafter, the court advised Mr. Sophanthavong of the constitutional rights he would be giving up by pleading guilty. The court stated:

> You give up a trial with a jury of twelve people, or a trial with a judge. You can give up a right to a jury trial and have the judge try the case if he or she wishes. You give up the right to cross-examine. That means ask questions of all the witnesses called by the state, police officers, doctors, anybody.
>
> You give up the right to call witnesses of your own, subpoena them, require them to come in and testify, and you give up the right to testify yourself. You don't have to testify at a trial, and if you don't, it won't be held against you.
>
> Now, if there is a trial, and the judge or the attorneys make a mistake, you have the right to appeal. No trial, no mis-

takes, so you basically give up the right to appeal everything except that the sentence is too harsh or it's an illegal sentence, beyond the power of the Court, something like that. You can still appeal that.

The court further advised Mr. Sophanthavong regarding duties under the plea agreement:

Let's assume that the other individual[s] who have been indicted or in the process of being indicted, I don't know on this, come to trial and you say, "I am not going to testify." In that case, the State can bring up all of the other charges again against you. . . . In other words, what you're doing is giving up what we call double jeopardy right, but you are giving up the right to say, "You already tried me on those cases."

When asked if he had any questions about the constitutional rights he would be waiving, Mr. Sophanthavong responded, "No."

Later in the hearing, Mr. Sophanthavong's trial counsel advised the court:

[W]ith respect to [the] voluntariness of this plea, it is a matter that he has spent many hours dealing with to the point where he has done his own research; that he has conferred with his family members. As the court pointed out, it's been extremely difficult for him. When you talk in terms of voluntariness, threats or promises, no, there hasn't [sic] been any threats or promises. Yes, it is voluntary. He made the decision. It is his choice.

The court then conducted further proceedings to confirm that Mr. Sophanthavong's guilty plea was knowing and voluntary. The court stated to Mr. Sophanthavong: "[M]y job is to see that this plea was made voluntarily, and what I want to know from you is that you know that you can go to trial on this if you want to, but you decided the best thing to do is not to go to trial; is that right?" Mr. Sophanthavong responded, "Yes, Your Honor."

On July 12, 1995, at the sentencing hearing, the court imposed the fifteen-year sentence stipulated to under the plea agreement, noting that it was an upward departure from the presumptive sentence of 120 to 121 months for felony murder as prescribed by the Oregon Sentencing Guidelines.

Mr. Sophanthavong filed a notice of appeal from the judgment of conviction. He was represented on appeal by David E. Groom, an attorney with the State Public Defender's Office. Mr. Groom filed a *Balfour* brief.[1] On December 23, 1996, the Oregon Court of Appeals affirmed the judgment without opinion. Mr. Sophanthavong did not petition the Oregon Supreme Court for review.

Thereafter, Mr. Sophanthavong filed a pro se petition for post-conviction relief in state court. Later, Noel Grefenson, an attorney in private practice, filed an amended petition for post conviction relief in which he alleged that Mr. Sophanthavong was denied effective assistance of trial counsel in violation of the Sixth and

---

1. A *Balfour* brief is the Oregon equivalent of the briefing system set forth by the Supreme Court in *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). *See Reese v. Baldwin*, 282 F.3d 1184, 1187 (9th Cir. 2002). In *State v. Balfour*, 311 Or. 434, 814 P.2d 1069 (1991), the Oregon Supreme Court set up a procedure by which counsel can notify the court that he or she feels the appeal lacks merit without withdrawing from representation of the appellant. *Id.* at 1078–79. A *Balfour* brief contains two parts: Part A is counsel's recitation of the facts and procedural history signed by counsel; Part B includes any issues the appellant wishes to raise and is signed by the appellant. *Id.* at 1080. The court is not required to review the record independently for error. *Id.*

Fourteenth Amendments on the following grounds:

Trial counsel advised petitioner that under Oregon's Second Look statutes (ORS 420A.200 et seq.), petitioner would be eligible for reduction of his sentence to a period of 60 months in prison....

Trial counsel failed to explain to petitioner that the presumptive sentence for felony murder under petitioner's criminal history score was 120 months, but that petitioner was stipulating to an upward departure of 240 months....

Trial counsel improperly advised petitioner that he could be convicted of aggravated murder and receive a life sentence if he went to trial.

In support of these claims, Mr. Sophanthavong submitted his deposition testimony and affidavits from his mother, father, and brother. In opposition, the government presented an affidavit from Mr. Bertoni, Mr. Sophanthavong's trial counsel.

In his affidavit, Mr. Bertoni stated that he had discussed the potential applicability of Oregon's "Second Look" statute, Or. Rev.Stat. § 420A.203 ("Second Look statute"), to Mr. Sophanthavong's sentence with counsel for one of Mr. Sophanthavong's co-defendants, and an individual with the Oregon Youth Authority. Based on those discussions, Mr. Bertoni believed the Second Look statute would apply to Mr. Sophanthavong if his sentencing took place after June 30, 1995. The prosecutor who participated in the plea negotiations, however, opined that the Second Look statute would not apply to Mr. Sophanthavong's sentence.

Mr. Bertoni further stated:

I told Mr. Sophanthavong about both of these views. No guarantees were made that he would be eligible for "Second Look." I made it clear to him that the question would have to be litigated, and

that it couldn't really be tested before he reached the half-way point of his sentence.

....

The case was thoroughly investigated before Mr. Sophanthavong decided to plead guilty to Felony Murder. We knew that someone else fired the shot that actually killed [Borisch], but there was no viable defense to any of the charges. Mr. Sophanthavong was advised of all his options and the status of the case before he decided to plead guilty. The decision to plead guilty was his.

The state post-conviction court denied the petition. The post-conviction court made the following findings:

Petitioner is not eligible for the "Second Look" provisions of ORS 420A.203, which would allow him to petition the court to reduce his sentence after he had served half his sentence.

Counsel did not tell petitioner before petitioner pled guilty that he would be eligible for "Second Look." Rather, counsel told petitioner that it was unclear at that time whether petitioner would be eligible for "Second Look," and that there was no guarantee that petitioner would be eligible.

Before he pled guilty, petitioner knew he would receive a [fifteen]-year sentence for the conviction.

Petitioner was advised of and understood the constitutional rights he was waiving by pleading guilty to Felony Murder, and he knew and understood the consequences of pleading guilty.

Petitioner's testimony that he would not have pled guilty and would have taken the case to trial if counsel had told him he was not eligible for "Second Look" is not credible.

Counsel did not advise petitioner that he could not be convicted of Aggravated Murder; however, petitioner presented no credible evidence that petitioner would have done anything differently than he did if counsel had so advised him.

Thus, after weighing the credibility of Mr. Sophanthavong and his trial counsel, the state post-conviction court dismissed the petition because it concluded that Mr. Bertoni had not misadvised Mr. Sophanthavong, and that he knowingly and voluntarily pled guilty. The Court of Appeals of the State of Oregon affirmed the post-conviction court's judgment without opinion. Thereafter, on August 15, 2000, the Oregon Supreme Court denied Mr. Sophanthavong's petition for review without opinion.

Mr. Sophanthavong filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in federal district court on October 23, 2000. In his petition, he asserted one constitutional claim: "that he was denied effective assistance of counsel based on his attorney's misleading and erroneous advice" regarding his guilty plea. The district court determined that in view of the state court's finding that Mr. Bertoni's testimony was credible, his representation did not fall below the standard of competency. The district court denied the habeas petition on August 30, 2002. This timely appeal followed.

## II

In this appeal, Mr. Sophanthavong asserts that his guilty plea was not knowing or voluntary because he was denied effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments. Specifically, Mr. Sophanthavong claims that his trial counsel misadvised him (1) that the Second Look statutes would apply to his sentence; (2) that the plea required him to stipulate to a sentence greater than the presumptive sentence; and (3) that he could be convicted of aggravated murder and face a sentence of thirty years. Mr. Sophanthavong argues that, but for Mr. Bertoni's erroneous and misleading advice, he would not have pled guilty.

We review de novo a district court's denial of a § 2254 petition. *Williams v. Woodford,* 306 F.3d 665, 684(9th Cir.2002). Findings of fact made by the district court are reviewed for clear error. *McNeely v. Blanas,* 336 F.3d 822, 826 (9th Cir.2003).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to Mr. Sophanthavong's § 2254 petition because it was filed after AEDPA's effective date of April 24, 1996. *Gill v. Ayers,* 342 F.3d 911, 917 (9th Cir.2003). AEDPA requires us to deny a petition for writ of habeas corpus unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). Furthermore, under AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct." A petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Clear and convincing evidence requires greater proof than preponderance of the evidence. To meet this higher standard, a party must present sufficient evidence to produce "in the ultimate factfinder an abiding conviction that the truth of its factual contentions are [sic] highly probable." *Colorado v. New Mexi-*

*co*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984).

## A.

Under Section 2254(e)(1), Mr. Sophanthavong has the burden of rebutting the presumption that a state court's determination of the factual issues is correct by clear and convincing evidence. Mr. Sophanthavong asserts that the state court's findings of fact are clearly erroneous. In support of this contention, Mr. Sophanthavong argues that in the deposition he submitted during the state post-conviction proceedings, he testified that his trial counsel had guaranteed that the Second Look statute applied to him. He further testified that he was informed that he could not be convicted of aggravated murder. Mr. Sophanthavong also contends that he would have gone to trial had his trial counsel properly advised him. Additionally, Mr. Sophanthavong relies on the affidavits of family members in challenging the state court's findings. In these affidavits, the affiants alleged that they encouraged Mr. Sophanthavong to plead guilty based on his counsel's advice.

The evidence presented by Mr. Sophanthavong to the district court is the same proof that the state court found was not believable. Mr. Sophanthavong did not submit any evidence in the district court to rebut the presumption that the state court's findings of fact and credibility determinations are correct as required by § 2254(e)(1).

In his petition for a rehearing, Mr. Sophanthavong states: "The panel's majority opinion overlooked the fact that the post-conviction court never conducted a trial or evidentiary hearing in order to make critical credibility determinations." Appellant's Petition for Rehearing at 3.

The quoted language does not accurately reflect the record of the state post-conviction proceedings. In fact, the state court conducted a post-conviction evidentiary hearing on December 2, 1997, pursuant to Or.Rev.Stat. § 138.620. Mr. Sophanthavong testified at the post-conviction proceeding. The State introduced Mr. Bertoni's affidavit in which he set forth the advice he gave his client. Mr. Sophanthavong's counsel at the post-conviction hearing stated he had no objection to the receipt of Mr. Bertoni's affidavit and forfeited his client's right to cross-examine his trial counsel. After observing Mr. Sophanthavong's demeanor as a witness, the state post-conviction court expressly found that he was not a credible witness.

■ Recently, we held in *Nunes v. Mueller*, 350 F.3d 1045(9th Cir.2003) that when a state court refuses to grant an evidentiary hearing to a petitioner who files for post-conviction relief, "we need not of course defer to the state court's factual findings." *Id.* at 1055. Here, because the state court conducted an evidentiary hearing in which Mr. Sophanthavong testified, we are required to defer to the state court's credibility findings. *See Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (holding that "Title 28 U.S.C. § 2254(d) gives federal habeas corpus courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state court, but not by them."); *see also Brown v. Poole*, 337 F.3d 1155, 1160 n. 2 (9th Cir.2003) ("We would indeed defer to all factual findings of the state court that are reasonable 'in light of the evidence presented in the state court proceedings.' ") (quoting *Greene v. Henry*, 302 F.3d 1067, 1072 (9th Cir.2002)); *Greene v. Henry*, 302 F.3d 1067, 1072 (9th Cir.2002) ("Under the AEDPA, we are required to 'defer to state court findings of fact unless based on an unreasonable determination of the facts in light of the evidence presented' in the

state court proceedings.") (quoting *Ainsworth v. Calderon*, 138 F.3d 787, 790 (9th Cir.1998), amended at 152 F.3d 1223).

## B.

■ Under AEDPA, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The state court adjudicated Mr. Sophanthavong's claim of ineffective assistance under the test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* test has two parts. First, an appellant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Second, he or she must show that his or her trial counsel's deficient performance prejudiced his or her defense. *Id.* at 687, 104 S.Ct. 2052. An appellant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

■ Under the first prong of the *Strickland* test, a court must look at "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. A court must scrutinize counsel's performance deferentially: "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. Counsel's performance will not be deemed ineffective unless it falls below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052.

■ To establish a claim of ineffective assistance of counsel based on alleged erroneous advice regarding a guilty plea, a petitioner must demonstrate more than a "mere inaccurate prediction." *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir.1986). "[E]rroneous predictions regarding a sentence are deficient only if they constitute 'gross mischaracterization of the likely outcome' of a plea bargain 'combined with … erroneous advice on the probable effects of going to trial.'" *United States v. Keller*, 902 F.2d 1391, 1394 (9th Cir.1990) (quoting *Iaea*, 800 F.2d at 864–65).

■ Mr. Sophanthavong asserts that Mr. Bertoni "misadvised" him regarding the applicability of the Second Look statute. The state court found that Mr. Bertoni did not guarantee that the Second Look statute would apply to Mr. Sophanthavong. Instead, he indicated that its applicability would have to be litigated. This determination is supported by Mr. Bertoni's allegation in his affidavit that he discovered that the prosecutor believed that the Second Look statute would not apply, while the Oregon Youth Authority, as well as counsel for a co-defendant believed it would apply. Although it was subsequently determined by the state post-conviction court that the Second Look statute did not apply to Mr. Sophanthavong, Mr. Bertoni's advice to Mr. Sophanthavong was at most a "mere incorrect prediction" of the application of the Second Look statute. *Iaea*, 800 F.2d at 865. It did not amount to a "gross mischaracterization of the likely outcome" of the plea bargain or trial. *Id.* at 864–65. Accordingly, the state post-conviction court's finding that Mr. Sophanthavong did not receive ineffective assistance of counsel regarding the applicability of the Second

Look statute was not based on an unreasonable determination of the facts.

██ Mr. Sophanthavong further contends that his trial counsel failed to explain that the plea required him to stipulate to a sentence that was greater than the presumptive sentence for felony murder. Given Mr. Sophanthavong's criminal history, the presumptive sentence for felony murder under the Oregon Sentencing Guidelines Grid was 120–21 months. Or. Sentencing Guidelines Grid, apps. 1–2. The stipulated sentence in the plea agreement was 180 months. The presumptive sentences set forth in the Oregon Sentencing Guidelines, however, are not binding and are subject to statutorily authorized departures. *State v. Dilts*, 179 Or.App. 238, 39 P.3d 276, 280–81 (2002). Mr. Sophanthavong's sentence was well below the maximum sentence for felony murder of 242 months. Thus, Mr. Bertoni's advice was not a gross mischaracterization of the possible sentence Mr. Sophanthavong would have faced if he had rejected the plea bargain.

██ Mr. Sophanthavong also argues, however, that his trial counsel "misadvised" him that he could be convicted of aggravated murder because the evidence shows that he did not personally shoot the victim. Mr. Sophanthavong contends that, under Oregon law, he could not be found guilty of aggravated felony murder under Section 163.095(2)(d) of the Oregon Revised Statutes ("Subsection (2)(d)").[2] The

---

2. The dissent argues that a person cannot be convicted of aggravated murder under Oregon law when the facts show that the homicide was committed by another participant in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator. The dissent relies on *State v. Cohen*, 42 Or.App. 297, 600 P.2d 892 (1979) for this proposition. This reliance is misplaced. In *Cohen*, the question before the Court of Appeals of Oregon was whether a person can be convicted of a violation of ORS 163.095(2)(d). The Court of Appeals held that "[o]nly the person who actually committed the homicide in the furtherance of or in flight from the felony has committed aggravated murder." *Id.* at 894. The Court of Appeals did not consider whether the same principle would apply to a person who aids and abets another in committing a murder "in an effort to conceal the commission of a crime, or conceal the identity of the perpetrator of a crime" in violation of ORS 163.095(2)(e).

The decision of the Court of Appeals in *Cohen* was reversed by the Supreme Court of Oregon twenty-four years ago in *Oregon v. Cohen*, 289 Or. 525, 614 P.2d 1156 (1980). The Supreme Court of Oregon held that "[f]or aggravated felony murder, ORS 163.095(2)(d) requires that the defendant personally commit the homicide." *Id.* at 529, 614 P.2d 1156. The Supreme Court did not consider whether a person accused of a violation of ORS 163.095(2)(e) must personally commit the homicide in an effort to conceal the commission of a crime, or the identity of the perpetrator. That issue was not before the Supreme Court of Oregon. Contrary to the dissent's argument, whether Mr. Sophanthavong would have faced a possible conviction for murder pursuant to ORS 163.095(2)(e) had not been resolved by any appellate court in Oregon when he entered his plea.

Thirteen years after its decision in *Cohen*, the Supreme Court of Oregon again stated in *State v. Wille*, 317 Or. 487, 858 P.2d 128 (1993), that, in a prosecution for a violation of Or.Rev.Stat. § 163.095(2)(d), the state must allege and prove that the defendant "personally and intentionally" killed the victim. 317 Or. at 492–94, 858 P.2d 128. Here, however, Mr. Sophanthavong was charged in the indictment with violating Or.Rev.Stat. § 163.095(e). That statute does not expressly require that the prosecution allege and prove, as essential elements, that the defendant personally and intentionally killed the victim. When read in conjunction with Or.Rev.Stat. § 163.115(1)(a)(b), Or.Rev.Stat. § 163.095(e) requires that the prosecution allege and prove that the defendant acting alone, or with one or more persons, is guilty of felony murder, and that the victim was killed by the defendant, or another participant, if any, with the intention of concealing the identity of the perpetrator of the felony.

Assuming arguendo that Mr. Bertoni's advice to his client regarding the elements nec-

prosecution's theory in alleging aggravated murder, however, was not based on Subsection (2)(d). Instead, it was based on Section 163.095(2)(e) of the Oregon Revised Statutes ("Subsection (2)(e)"). Under Subsection (2)(e), a person is guilty of aggravated murder if "[t]he murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime."

Section 163.095 defines "aggravated murder" as "murder" within the meaning of Section 163.115. Section 163.115(1)(b) defines "murder" as criminal homicide

> [w]hen it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit [burglary or robbery in the first degree] and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, *or another participant if there be any,* causes the death of a person other than one of the participants.

(emphasis added).

Mr. Sophanthavong and his coconspirator, Danny Alcazar, were charged in Count 1 of the indictment with

> unlawfully and intentionally, in an effort to conceal the identity of the perpetrator of the crime of Robbery in the First Degree and Burglary in the First Degree, cause the death of another human being, to wit: JOAN BORISCH, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon.

Thus, combining Section 163.115(1)(b)'s definition of "murder" with Subsection

(2)(e), an individual can be convicted of aggravated murder when he or she participated in a burglary or robbery that resulted in a criminal homicide that was committed in an effort to conceal the commission of a crime, even though the accused did not commit the homicide.

*Strickland* does not mandate prescience, only objectively reasonable advice under prevailing professional norms. 466 U.S. at 690, 104 S.Ct. 2052. Counsel was not required to predict accurately how the Oregon courts would resolve the question whether the evidence was legally sufficient to support a conviction for aggravated murder if the matter had gone to trial. Accordingly, the state court's holding that Mr. Sophanthavong did not receive ineffective assistance with regard to the charge of aggravated murder was not based on an objectively unreasonable determination of the facts.

### C.

■ In addition to showing that his trial counsel's assistance was ineffective, Mr. Sophanthavong must show that, but for trial counsel's advice, he would not have pled guilty. Mr. Sophanthavong claims that his plea was not knowingly and voluntarily made because of his trial counsel's inadequate assistance. The state post-conviction court, however, found that Mr. Sophanthavong was advised of the constitutional rights he was waiving and presented no evidence that he would not have pled guilty had counsel advised him differently.

It is undisputed that Mr. Sophanthavong knew he was stipulating to a sentence of

---

essary to prove a violation of Or.Rev.Stat. § 163.095(e) will, someday, prove to be inaccurate based on a future Oregon appellate court's construction of Or.Rev.Stat. § 163.095(e), Mr. Sophanthavong has failed to demonstrate that his trial counsel's reading

of that statute was a gross mischaracterization of *existing* Oregon case law. The Oregon Supreme Court's decisions in *Cohen* and *Wille* do not support Mr. Sophanthavong's claim of ineffectiveness of counsel.

fifteen years. Mr. Sophanthavong was facing five other counts in addition to the charge of felony murder to which he pled guilty. In exchange for his plea, the State dismissed all of the other charges against him. There was substantial evidence that Mr. Sophanthavong planned and executed the robbery and burglary, and that he assaulted the murder victim before she was shot. Thus, Mr. Sophanthavong faced a much higher sentence than fifteen years had he not pled guilty and gone to trial.

Moreover, although Mr. Sophanthavong initially indicated his reluctance to plead guilty, Mr. Sophanthavong stated on three separate occasions that his plea was voluntary, and that he understood the constitutional rights he was waiving. The state post-conviction court found that Mr. Sophanthavong's statement that he would not have pled guilty had his trial counsel properly advised him was not credible. In addition, the trial court indicated during the sentencing proceedings that the 180–month sentence was in essence an upward departure from the presumptive sentence. Accordingly, Mr. Sophanthavong was informed that he was facing an upward departure prior to being sentenced. He did not move to set aside his plea after being informed he would receive a sentence that departed upward. We hold that the state post-conviction court's finding that Mr. Sophanthavong would still have pled guilty to the crime of felony murder and the sentence of 180 months was not objectively unreasonable.

### D.

In his reply brief, Mr. Sophanthavong asserts that Mr. Bertoni's statement with regard to the voluntariness of his plea should be given great weight by this court because he was a juvenile at the time of his plea. At the change of plea hearing before the trial judge had explained the constitutional rights Mr. Sophanthavong was waiving by pleading guilty, Mr. Bertoni stated:

> [Mr. Sophanthavong] wanted the court to know in his mind this was really the only choice because of the potential consequences and risks that were involved if he were to take the matter to trial. He feels in some ways that diminishes the voluntariness because there weren't that many options available. There weren't that many choices, but there is no doubt in my mind that this is a knowing decision on his part.

Mr. Sophanthavong thus appears to raise a new constitutional argument in his reply brief, namely that he was deprived of his due process rights under the Fifth and Fourteenth Amendments by the trial court's acceptance of his guilty plea because it was not knowingly and voluntarily made. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (stating that the Fifth Amendment requires that waiver of a defendant's right to jury trial be voluntary and knowing).

Mr. Sophanthavong, however, did not claim in his amended petition for post-conviction relief in the state court that his plea was not knowing and voluntary because he was a juvenile when he pled guilty. In his opening brief, Mr. Sophanthavong notes that the amended petition "raised only issues of ineffectiveness assistance of trial counsel" based on erroneous advice regarding the punishment he would face and whether he could be convicted of aggravated murder if the case went to trial. Appellant's Opening Brief at 7.

Mr. Sophanthavong did not raise a due process claim based on a lack of capacity to make a knowing and voluntary waiver of his federal constitutional rights because he was a juvenile before the district court or in his opening brief before this court. In

fact, in his opening brief Mr. Sophanthavong stated that his § 2254 petition was limited "to the single claim of ineffectiveness of counsel presented here." Appellant's Opening Brief at 9.

"[A]n appellate court will not consider issues not properly raised before the district court. Furthermore, on appeal, arguments not raised by a party in its opening brief are deemed waived." *Smith v. Marsh,* 194 F.3d 1045, 1052(9th Cir.1999). The unfairness of such a tactic is obvious. Opposing counsel is denied the opportunity to point to the record to show that the new theory lacks legal or factual support. Because Mr. Sophanthavong raised his due process claim for the first time in his reply brief, we decline to reach it.

## CONCLUSION

Under § 2254(d)(1) of AEDPA, a habeas corpus petition cannot be granted unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Here, the state post-conviction court correctly applied clearly established Supreme Court precedent in considering Mr. Sophanthavong's claim that he was denied effective assistance of counsel. Therefore, the state court's denial of Mr. Sophanthavong's petition for post-conviction relief was not based on an unreasonable application of clearly established federal law.

We are required to presume the correctness of the state court's factual finding that Mr. Bertoni did not misadvise Mr. Sophanthavong pursuant to § 2254(e)(1). Mr. Sophanthavong has failed to rebut this presumption by clear and convincing evidence.

**AFFIRMED.**

FERGUSON, Circuit Judge, dissenting.

When he pled guilty to felony murder, as his lawyer advised him to do, Somphalavanh Sophanthavong was seventeen years old. That guilty plea was neither knowing nor voluntary. Because the majority treats this juvenile defendant as though he had the maturity of an adult in its evaluation of the voluntariness of his guilty plea, I dissent.

Somphalavanh's guilty plea was not knowing or voluntary because he was denied effective assistance of counsel when (1) his trial lawyer misadvised him that he could be convicted of aggravated murder and face a sentence of thirty years; (2) his lawyer misadvised him that the Second Look statutes would apply to his sentence; and (3) he unknowingly stipulated to a sentence greater than the presumptive sentence.

### 1. Aggravated murder

The majority writes that, under Oregon law, "an individual can be convicted of aggravated murder when he or she participated in a burglary or robbery that resulted in a criminal homicide that was committed in an effort to conceal the commission of a crime, even though the accused did not commit the homicide." This is simply not true. In *State v. Cohen,* 42 Or.App. 297, 600 P.2d 892, 894 (1979), the Oregon Court of Appeals held that, in contrast to felony murder, "there is no vicarious liability for aggravated murder. Only the person who actually committed the homicide in the furtherance of or in flight from the felony has committed aggravated murder. An indictment for aggravated murder, therefore, must allege that the defendant personally committed the homicide." [1]

1. *State v. Cohen,* 289 Or. 525, 614 P.2d 1156 (Or.1980), reversed the Oregon Court of Ap-

More recently, in *State v. Wille,* 317 Or. 487, 858 P.2d 128 (1993), the Oregon Supreme Court emphasized that though "aggravated murder" and "aggravated felony murder" may be thought of separately, a necessary element of each crime is that the murder be committed intentionally. The defendant in *Wille* (like the defendant in *Cohen* ) had been charged under Or. Rev.Stat. § 163.095(2)(d), which defines aggravated felony murder. *Id.* at 132. The Oregon Court said that "the underlying crime of aggravated felony murder is *felony* murder ... but, the aggravating circumstance is that a defendant committed the homicide 'personally and *intentionally* '." *Id.* (emphasis in original).

The majority protests that this "personally and intentionally" requirement only applies to persons charged under § 163.095(2)(d); Somphalavanh was charged under § 163.095(2)(e), which lists a different aggravating circumstance (that the murder was committed to conceal the commission of a crime or the identity of the perpetrators). However, the *Wille* Court did not analyze § 163.095(2)(d) alone. The Court explicitly addressed the rest (there are seventeen total) of the aggravating circumstances listed in § 163.095: "The 16 other possible aggravating circumstances relate specifically to aggravation of an underlying crime of intentional murder, as defined by O[r.] R[ev.] S[tat. § ] 163.115(1)(a)." [2] *Id.* The *Wille* Court concluded that "[a]ggravated murder, then, may be defined as a murder that is committed intentionally, plus something more. In that sense, intentional murder necessarily is a lesser-included

offense of aggravated murder." *Id.* at 133. By referring to all "16 other possible aggravating circumstances," the Court necessarily included § 163.095(2)(e), the subsection under which Somphalavanh was charged, in the list of aggravating circumstances which may transform intentional murder into aggravated murder. Its conclusion that intentional murder is an element of aggravated murder likewise applies to charges of aggravated murder under § 163.095(2)(e).

The Oregon Uniform Criminal Jury Instructions covering "Aggravated Murder" at the time of Somphalavanh's plea reflect the holdings of these cases; the Instructions state that "Oregon law provides that a person commits the crime of aggravated murder *if that person intentionally causes the death of another human being* under, or accompanied by, certain defined circumstances." Or. St. Bar Comm. on Unif. Crim. Jury Instructions, Uniform Criminal Jury Instruction No. 1301, Oct. 1994 (emphasis added).

Somphalavanh did not personally kill Joan Borisch. The state acknowledges that Borisch was shot by another youth, "Tad." Because he was not the shooter, Somphalavanh could not have been convicted of aggravated murder under Oregon law. In advising Somphalavanh that he faced a possible conviction for aggravated murder, trial counsel did not merely fail "to predict accurately ... whether the evidence was legally sufficient to support a conviction for aggravated murder if the matter had gone to trial," as the majority suggests. No competent lawyer could rea-

peals and held that the wording of the defendant's indictment was sufficient to serve notice that the State intended to prove that he personally had committed the alleged homicide. However, in that decision, the Oregon Supreme Court specifically agreed with the Court of Appeals that aggravated felony mur-

der "requires that the defendant personally commit the homicide." *Id.* at 1158.

2. Section 163.115(1)(a) defines criminal homicide as murder "[w]hen it is committed intentionally." The next subsection, § 163.115(1)(b), defines felony murder.

sonably have concluded that Somphala-vanh would have risked an aggravated murder conviction by going to trial.

### 2. Stipulation to an upward departure from the presumptive sentence

His trial lawyer also failed to explain to Somphalavanh that he was stipulating to a five-year upward departure from the presumptive sentence. The majority finds the lawyer's failure excusable because, during the sentencing proceeding, the court mentioned that the 180–month sentence was an upward departure. This is irrelevant as to whether Somphalavanh's lawyer was ineffective, since the sentencing proceeding took place *after* the guilty plea. As this, as the majority concedes, was the only notice Somphalavanh had that he was agreeing to an extra five years in custody, the plea itself was uninformed.

The majority responds that Somphala-vanh knew he was facing an upward departure prior to being sentenced, at least, and that he should have "move[d] to set aside his plea after being informed he would receive a sentence that departed upward." If the majority is suggesting that Somphalavanh's lawyer should have so moved, it misses the point: there is no allegation that the lawyer did not realize that Somphalavanh was stipulating to an upward departure, only that he did not share that information with his client. Alternatively, if the majority meant to suggest that Somphalavanh himself should personally have made such a motion, it also erred. It would be unrealistic, to put it mildly, to expect that a juvenile defendant would know that it is possible for a court to set aside a plea, let alone to expect him to

make a motion so requesting. *See In re Gault,* 387 U.S. 1, 39 n. 65, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ("The most informal and well-intentioned of judicial proceedings are technical; few adults without legal training can influence or even understand them; certainly children cannot.")

### 3. The Second Look statute

Somphalavanh contends that his lawyer had told him that he would be eligible for Second Look, a state procedure under which juvenile defendants may petition for a sentence reduction after serving half of their sentence. He further contends that he would have gone to trial had he been properly advised by his lawyer. The state post-conviction court found this testimony not credible. Instead, it credited the trial lawyer's testimony that the lawyer had not told Somphalavanh that he would be eligible for Second Look, but rather had said that it was unclear at the time whether Somphalavanh would be eligible. The majority finds no reason to rebut the presumption that the state court's credibility determinations on these matters were correct.

However, there is ample reason to question the state court's credibility determinations. The state post-conviction court made these critical determinations at what was essentially a "paper" hearing: the parties submitted affidavits or deposition statements from Somphalavanh's trial counsel, Somphalavanh's mother, Somphalavanh's father, Somphalavanh's brother, and Somphalavanh himself. The fact that Somphalavanh personally answered three questions put to him by post-conviction counsel (two of them yes-or-no questions) in front of the court [3] does not transform

---

**3.** Somphalavanh's entire testimony was as follows:

Q: Mr. Somphalavanh Sophanthavong, did Mr. Bertoni, your trial attorney,

discuss with you what he thought would happen if you went to trial on the Aggravated Murder charge?

A: **Yes, he did.**

the proceeding into an "evidentiary hearing," much less the sort of hearing to which we owe strong deference. *See Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir.2003) ("[W]ith the state court having refused Nunes an evidentiary hearing, we need not of course defer to the state court's factual findings ... when they were made without such a hearing.").

The majority writes that "[a]fter observing Mr. Sophanthavong's demeanor as a witness, the state post-conviction court expressly found that he was not a credible witness." The majority presumably refers to the state court's finding that "Petitioner's testimony that he would not have pled guilty and would have taken the case to trial if counsel had told him he was not eligible for 'Second Look' is not credible." However, Somphalavanh never testified in front of the state court with regard to the Second Look issue; his lawyer only questioned him on the topic of the aggravated murder charge.[4] With regard to the Second Look question, the state court determined that one side was credible and the other side was not credible based solely on affidavits and deposition statements. It had no opportunity to confront any of the witnesses (which included the trial lawyer and three of Somphalavanh's immediate family members) as they gave their testimony.

Moreover, evidence exists to support Somphalavanh's contention that he would have gone to trial if properly advised. At the time Somphalavanh's plea was entered, his trial lawyer said that Somphalavanh "wanted the Court to know in his mind this was really the only choice because of the potential consequences and risks that were involved if he were to take the matter to trial. He feels in some ways that diminishes the voluntariness because there weren't that many options available." Somphalavanh's guilty plea was based on the erroneous advice received from his lawyer regarding those "potential consequences and risks." *See Parke v. Raley*, 506 U.S. 20, 29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) ("The standard ... remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.") Had Somphalavanh correctly understood the potential consequences of the options before him, there is reason to believe that his decision would have been different.

### 4. Juvenile waiver of rights

The same circumstances which present no constitutional violation for an adult defendant may violate the constitutional rights of a juvenile. Regardless of whether the advice of Somphalavanh's trial counsel would have been adequate if given to an adult in his situation, the advice given to Somphalavanh, then a juvenile of diminished maturity, was ineffective and rendered his guilty plea uninformed and involuntary.

The record suggests that Somphalavanh is of above-average intelligence: he earned a B + average in his freshman year of high school, for instance. However, in the case of juveniles, intelligence and maturity are distinct factors, and it is critical to understand where an adolescent criminal defen-

---

Q: What did he tell you?
A: **I could get convicted of Aggravated Murder.**
Q: If he had told you that legally you could not be convicted of Aggravated Murder, would you still have entered a plea to the charge of Felony Murder?
A: **No.**

4. The state court apparently did believe that Somphalavanh was telling the truth in his first two in-court answers, since the court found that "Counsel did not advise petitioner that he could not be convicted of Aggravated Murder."

dant is on a developmental level. Marty Beyer, *Immaturity, Culpability & Competence in Juveniles: A Study of 17 Cases,* Crim. Just., Summer 2000, at 27; *Youth in the Criminal Justice System: Guidelines for Policymakers and Practitioners* 2001 A.B.A.Crim. Just. Sec. 7, 39–40.

Clinical psychologist Orin Bolstad, who examined Somphalavanh, said that Somphalavanh "has a fair amount of immaturity" and commented that "he's a youngster who was delayed in his development, and he's a youngster that is catching up." Dr. Bolstad attributed much of that developmental delay to the fact that Somphalavanh had to try to learn three languages prior to the age of five as well as to the fact that, in early childhood, Somphalavanh was sick with malaria for a very long period of time, delaying his walking and other age-appropriate social interactions. Dr. Bolstad also said that Somphalavanh's adjustment difficulties most likely occurred through much of his life.[5] At the time of his plea, Somphalavanh was significantly less mature than typical adolescents of similar age and intelligence.

The U.S. Supreme Court has long held that when a juvenile defendant waives constitutional rights, the child's diminished capacity due to age must be taken into account in determining whether the waiver was valid.[6] In *Haley v. Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948), for instance, the Court said that "when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any

race. He cannot be judged by the more exacting standards of maturity." The point was made even more firmly in *Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962):

> The prosecution says that the youth and immaturity of the petitioner . . . are irrelevant. . . . But if we took that position, it would, with all deference, be in callous disregard of this boy's constitutional rights. He cannot be compared with an adult in full possession of his senses and knowledge of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights.

Both of these statements were made with regard to custodial interrogations of a juvenile by police; here, the context is a guilty plea. However, there is no meaningful difference: both situations involve juvenile waiver of constitutional rights through an admission to state authorities. In both contexts, the importance of the presence of competent legal counsel is heightened where the individual making the admission or plea is a juvenile. Although a court itself has a duty to inquire personally into the voluntary and knowledgeable nature of a guilty plea by a criminal defendant, the "primary burden of explaining the implications of a guilty plea to a youth should be on the defense attorney, who should be trained in communicating effectively with youthful clients." *Youth in the Criminal Justice System* at 18. The adequacy of counsel cannot be mea-

---

**5.** Dr. Bolstad testified that these adjustment difficulties had led Somphalavanh to carry a considerable amount of anxiety and some degree of depression.

**6.** "Under the Supreme Court's due process jurisprudence, a criminal defendant's age has long been a relevant factor in determining

whether a . . . waiver of a constitutional right was voluntary." *Alvarado v. Hickman,* 316 F.3d 841, 848 (9th Cir.2003) (holding that a state court erred in failing to take the petitioner's juvenile status into account in analyzing whether petitioner was in custody for *Miranda* purposes).

sured without taking into account the diminished maturity of the child.

Modern developmental psychology indicates that, relative to adults, adolescents as a group make "decisions as defendants in the legal process [which] reflect cognitive and psychological immaturity." Elizabeth S. Scott & Thomas Grisso, *The Evolution of Adolescence: A Developmental Perspective on Juvenile Justice Reform,* 88 J.Crim. L. & Criminology 137, 139 (1997). For example, "adolescents use information less effectively, and tend to exhibit less independent thinking in their decision making, than adults." Kim Taylor–Thompson, *States of Mind/States of Development,* 14 Stan. L. & Pol'y Rev. 143, 153 (2003). Adolescents are also less capable than adults of "generat[ing] alternative possibilities" when faced with a decision. Marty Beyer, *Recognizing the Child in the Delinquent,* Ky. Child. Rts. J., Summer 1999, at 17. Because of this immaturity, juveniles' ability to participate in various activities (such as operating automobiles or serving on a jury) or to make decisions for themselves (regarding matters such as marriage or undergoing medical procedures) are restricted by law. *See Stanford v. Kentucky,* 492 U.S. 361, 395, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) ("minors are treated differently from adults in our laws, which reflects the simple truth derived from communal experience that juveniles as a class have not the level of maturation and responsibility that we presume in adults and consider desirable for full participation in the rights and duties of modern life") (Brennan, J., dissenting).

Because of juveniles' "inability to make critical decisions in an informed, mature manner" (in conjunction with their "peculiar vulnerability" and "the importance of the parental role in child rearing"), the Supreme Court has held that constitutional principles should not be applied to juveniles in exactly the same manner they are applied to adults. *Bellotti v. Baird,* 443 U.S. 622, 634, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). In this case, the state post-conviction courts, as well as the majority, erred because they took no account of the fact that Somphalavanh was a seventeen-year-old boy of diminished maturity when he pled guilty to felony murder. I respectfully dissent.